## Case No. 9,511.

### In re METZGER.

[5 N. Y. Leg. Obs. 83.]

District Court, S. D. New York. Jan. 16, 1847.

EXTRADITION—HOW EFFECTUATED — EVIDENCE — SUFFICIENT TO JUSTIFY TRIAL—FEDERAL JURISDICTION—EXTRATERRITORIAL OFFENSES — TREATIES—BASIS OF EXAMINATION OF FUGITIVE.

[1. The extradition of a fugitive from justice of a foreign country can only be effectuated through the agency of the tribunals of justice, whose province it is to determine the existence of reasonable cause for the charge of crime, and, if there be sufficient evidence, to justify putting the accused upon his trial.]

[2. All federal courts inferior to the supreme court receive their creation and allotment of jurisdiction from congress, and can exercise only such as is confided by law; but, after jurisdiction is designated, the court will take cognizance of all matters which fall within the scope of its powers, without special appointment of law.]

[3. Transactions declared by law to be offenses occurring in foreign territories, on the high seas or elsewhere, are within the jurisdiction of the circuit and district courts under the judiciary act of 1789 (1 Stat. 73) and its kindred statutes, and such courts must receive complaints, take evidence, issue warrants, and apprehend and commit a person accused of such offenses, without further authorization for so doing than their general capacity to take cognizance of crimes.]

[4. The provisions in a treaty addressed to the judicial power become a rule of law of themselves, and are carried into execution by the courts, without other direction or authority.]

[5. A treaty, when addressed to the judicial power, being of equal force with an act of congress, the provisions of the treaty with France of November 9, 1843, for extradition of fugitives from justice requiring the investigation of charges of crime, and the arrest and imprisonment of the accused as for trial, are binding on the courts.]

[6. Testimony of a vice consul that he has received official information from his government that an alleged fugitive from justice stands charged with the crime of forgery, and also of a person that he was defrauded by the accused, whom he pursued through several countries to the United States, together with verified depositions on regular proceedings before the judge of instruction regularly certified by the inferior officers, and also under the great seal of the minister of foreign relations, are sufficient to support a charge of crime, and justify apprehending the accused and detaining him for trial.]

[7. The questions whether the United States government is bound by a treaty compact to deliver up an alleged fugitive from justice apprehended and detained by a federal court for trial, for offenses committed by him in the foreign country, not crimes by our laws, whether he is within the description of persons named in the treaty as subject to extradition, when the treaty went into operation and became obligatory, and whether the obligations assumed by the treaty will be fulfilled, are addressed to the political, and not the judicial, department.]

[8. The laws of France, and not those of the United States, form the basis for the inquiry as to whether an extraditable offense has been committed under the treaty of November 9, 1843, providing that the laws of the place of refuge are to be applied to the investigation as "if the crimes had been committed" where the arrest was made.]

[9. A person against whom a complaint has been made and accepted before a judge of instruction in France is a person accused, within the meaning of the treaty of extradition, although no indictment has been found against him.]

[10. A treaty will take effect from its date, irrespective of its ratification, unless a different period is fixed by the contracting parties, or must be adopted in order to fulfill their manifest intention.]

[On warrant for the apprehension of Nicholas Lucien Metzger, an alleged fugitive from justice.]

BETTS, District Judge. The United States attorney for this district, under instructions from the secretary of state, and by direction of the president, appeared before me, and prayed judicial action on a requisition made on the president, through the medium of the diplomatic agents of the French government. The requisition demands, pursuant to the treaty of November 9, 1843, between the two governments, that Nicholas Lucien Metzger be delivered up to justice, he being charged with having committed the crime of forgery in France, and having since sought an asylum in the United States, and being now found within the Southern district of New York. The same application had been previously made to a magistrate of the state of New York, and his order directing the apprehension and commitment of Metzger was subsequently set aside by the circuit judge, and the prisoner was discharged from the arrest, on habeas corpus, upon the ground that the judicial authorities of the state of New York have no jurisdiction in the case. I granted a warrant for his apprehension, and he was brought before me by the marshal, accompanied by Messrs. Hoffman & Blunt, his counsel. Mr. Butler, the United States attorney, appeared in behalf of the United States, and Messrs. Cutting & Tillou in support of the requisition on the part of the French government. The counsel for Metzger took exception to the competency of a judge of the United States to grant a warrant of arrest, and also to the adequacy of the evidence produced, to justify the commitment of the accused. The discussions of the various topics brought in review have been marked with great learning and ability, and were prolonged, several adjournments intervening from the 10th to the 28th of December. The counsel on both sides supported their arguments by numerous citations of treatises on international law; treaty compacts between the United States and foreign powers, and those between foreign powers alone; diplomatic correspondences; executive and legislative documents and debates; the municipal laws of France and their explications; the laws of the United States and of the state of New York; and the decisions of the United States courts, and courts of

the respective states, and of England. It being admitted on both sides that Metzger is now in confinement in this district on civil process, and must remain in detention for a considerable period, irrespective of the disposition to be made of this application, I have not deemed it expedient to defer other public business pressing urgently on my time, in order to give this case more immediate dispatch. Having examined carefully the authorities referred to by counsel, and weighed the reasonings submitted to me, I avail myself of the earliest opportunity to state the result of my reflections upon the subject.

The question lying at the foundation of all others, and naturally first to be considered, touches the jurisdiction of the United States judiciary over the subject-matter. A treaty under the constitution of the United States may have a double aspect and operation: First, that accompanying it as a compact between sovereign powers and governed by the law of nations; and, secondly, one equivalent to an act of the legislature, our constitution declaring a treaty to be the law of the land. Article 6. In the latter case it operates of itself, without the aid of any legislative provision; but in the former the legislature must execute the contract before it can become a rule for the courts. Foster v. Neilson, 2 Pet. [27 U. S.] 314. To determine the operation of this convention, it must be ascertained whether it imports the necessity of judicial aid to carry it into execution, and whether it communicates that degree of authority which enables the judges of the United States, as individual magistrates, to take cognizance of it. Without inquiring into the polity of France, and the probable operation of the treaty in this respect within her dominions, it is manifest that the provision demanding the apprehension and commitment of persons charged with crimes cannot be carried into effect in this country, but by aid of judicial authority. Not only in the distribution of the powers of our government does it appertain to that branch to receive evidence and determine upon its sufficiency to arrest and commit for criminal offences, but the prohibition in the constitution against issuing a warrant to seize any person except on probable cause first proved necessarily imports that issuing such warrant is a judicial act. [Ex parte Burford] 3 Cranch [7 U. S.] 448; Amend. Const. art. 3. It is believed this doctrine is firmly established in the jurisprudence of this country and England, in respect to the surrender of fugitives from justice, whether the obligation to surrender is deduced from the law of nations, or is recognized only when expressly stipulated by treaty. In every authority I have consulted, it seems to be regarded as an elementary principle that the extradition is to be effectuated through the agency of the tribunals of justice whose province it is to determine the existence of reasonable cause for the charge of crime, and if there be sufficient evidence to justify putting the accused upon his trial. 1 Kent, Comm. 37; Story, Confl. Law, 627, and note; 1 Am. Jur. 297; 4 Johns. Ch. 106; [Holmes v. Jennison] 14 Pet. [39 U. S.] 540; U. S. v. Davis [Case No. 14,932]; Ex parte Dos Santos [Id. 4,016]; Basset's Case, 1 New Sess. Cas. (Eng.) 33.

"Jay's Treaty," as it is usually termed, the treaty with England of Nov. 19, 1794, introduced the same stipulation in regard to the surrender of fugitives from justice, that is adopted in the treaty. The attention of the executive, judicial and legislative departments of government were early aroused to a most excited attention to the effect and operation of the provision, and to the appropriate method of carrying it into execution. The British authorities demanded the surrender of a seaman, Robbins, on a charge of murder, committed by him at sea, on board an English man-of-war. The president invoked the interposition of the United States judge of South Carolina, to examine the evidence and to take order for the arrest of the accused. He was apprehended and committed upon the warrant of the judge, and thereupon delivered over by the president to the English government. Soult v. L'Africaine [Case No. 13,179]; 1 Hall, Jour. Jur. 13–27. The subject was brought before congress the succeeding session, and the functions of the executive and judicial departments were most thoroughly examined and discussed, by men of the highest name in the juridical annals of the country. 5 Wheat. [18 U. S.] Append. 19; U. S. Gaz. 1800. In looking over the report of the proceedings before the United States judge, and the debates in congress, so far as they are preserved in the papers of the day, I do not find the suggestion made, that the apprehension and commitment by the judge, were not by competent authority. The great struggle by counsel before the court, and in the debates in congress, was to maintain that the offence charged in that case was triable under our laws, and in this country, and if not, that it belonged to the judiciary and not to the executive, to decide whether the casus foederis existed, and if the accused was subject to extradition. These views were maintained by Mr. Nicholas, Mr. Gallatin, Mr. Livingston and others, and combatted by Mr. Marshall, Mr. Dana, Mr. Otis, Mr. Harper, Mr. Bayard and others. The house, after a prolonged discussion, by a vote of 65 to 39, affirmed the correctness of the procedure in the case, and I do not meet with an instance since that period in which the justness of the decision has been called in question. I am satisfied that such also is the sound exposition of the corresponding provision in this treaty, and that the government can only fulfil its engagement in this respect, by the instrumentality of the judicial tribunals.

Whether the judiciary can act in the mat-

ter without direction, or express authorization by act of congress, is the next question in order, and that on which there would seem to be more difficulty and more ground for doubt. But I am persuaded the question is susceptible of a satisfactory solution. The judicial power of the United States extends to all cases in law and equity, arising under the constitution, the laws of the United States, and treaties made under its authority. Const. art. 3, § 2; [Chisholm v. Georgia] 2 Dall. [2 U. S.] 475. A case arises under the constitution or a treaty, when the subject-matter in contestation is controlled by either, or the correct decision of it depends on their construction. 3 Story, Const. Law, 1640, 1642; [Osborne v. Bank of U. S.] 9 Wheat. [22 U. S.] 819; [Holmes v. Jennison] 14 Pet. [39 U. S.] 540. But although a subject comes within the scope of the powers of the judiciary, and is properly referable to their authority, still it is cardinal principle of our jurisprudence that no subordinate court or magistrate can take cognizance of it, without express authorization by law. The supreme court, being created by the constitution, may derive jurisdiction directly from its authority, and may probably, without the aid of legislation, supply the law of procedure necessary to the exercise of such jurisdiction. [Chisholm v. Georgia] 2 Dall. [2 U. S.] 419; [Rhode Island v. Massachusetts] 12 Pet. [37 U. S.] 657. But all tribunals inferior to the supreme court receive their creation and allotment of jurisdiction from congress, and can exercise no other than such as is confided to them by law. The constitution and law must accordingly concur in conferring jurisdiction, in order to put in action in those courts the powers imparted to the judicial department. Ex parte Cabrera [Case No. 2,278]; U. S. v. Nine Packages of Linen [Id. 15,884]; Livingston v. Jefferson [Id. 8,411]; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 336; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76; [American & Ocean Ins. Co. v. 356 Bales of Cotton] 1 Pet. [26 U. S.] 545; [U. S. v. Coombs] 12 Pet. [37 U. S.] 72. The further general principle is equally settled, that after a court is established and its jurisdiction designated, it takes cognizance of all matters then existing, or afterwards arising, which fall within the scope of its powers, without those particulars being assigned to it by special appointment of law. This is so in respect to cases of common-law and admiralty jurisdiction. Burke v. Trevitt [Case No. 2,163]; The Abby [Id. 14]; Picquet v. Swan [Id. 11,134]; Davis v. New Brig [Id. 3,643]; [Glass v. The Betsey] 3 Dall. [3 U. S.] 6; [Penhallow v. Doane] Id. 54; [Bank of U. S. v. Planters' Bank] 9 Wheat. [22 U. S.] 931; [Postmaster General v. Early] 12 Wheat. [25 U. S.] 136; [Kendall v. U. S.] Id. 527. And the like doctrine is applicable to cases of criminal jurisdiction. U. S. v. Coolidge [Case No. 14,857]; [U. S. v. Hudson] 7 Cranch [11 U. S.] 32; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 336; [U. S. v. Wiltberger] 5 Wheat. [18

U. S.] 76; [Jones v. Shore] 1 Wheat. [14 U. S. 467. The judiciary act of September 24, 1789, and subsequent statutes organizing the courts of the United States, and distributing amongst them, the subjects over which their jurisdiction may be exercised, allot to the circuit and district courts cognizance of all crimes and offences cognizable under the authority of the United States; and accordingly, transactions declared by law to be offences occurring in foreign territories, on the high seas, or elsewhere, fall necessarily within the criminal jurisdiction of those courts. They must receive complaints, take evidence, issue warrants, apprehend and commit persons accused of such offences, without further authorization for so doing, than their general capacity to take cognizance of crimes.

The inquiry to be answered, then, is whether the provisions of this convention create a case upon which that criminal jurisdiction attaches. The authorities quoted have relation generally to legislative enactments as necessary to enable the tribunals to exercise their jurisdiction; yet it is manifest that the aim of the courts in these cases was to determine the extent of the inherent powers of the judicial department,—how far they can exercise powers derived directly from the constitution, without other authorization by law, and reference was had to laws enacted by congress, because in the cases under adjudication there was no other source from which the law required could emanate. Treaties are placed by the constitution in the same rank with acts of congress, and even with the constitution itself, for by the sixth article it is declared that "this constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." It has been repeatedly decided by the supreme court that under this provision of the constitution, a treaty becomes equivalent to a law of congress, and where its stipulations apply, they must be observed and enforced by the court, in adjudging as well upon individual rights as those of the nation. [U. S. v. The Peggy] 1 Cranch [5 U. S.] 109, 110; [Foster v. Neilson] 2 Pet. [27 U. S.] 314. A great distinction exists between the effect and operation of treaties under our constitution, and that given them in England. 3 Story, Const. Law, 1515. In that country a treaty is regarded only as a contract addressed to the political power and an act of parliament is required to give it effect infraterritorially. 1 New Sess. Cas. [Eng.] 33. But in the United States the provisions in a treaty addressed to the judicial power become a rule of law of themselves, and are carried into execution by that department without other direction or authority. [Foster v. Neilson] 2 Pet. [27 U. S.] 314. The engagements of this treaty are accordingly to be accepted by the courts the same as if they were incorporated in a statute, and it is not

supposed that a reasonable doubt could be entertained, if a law of congress had directed the president to deliver up fugitives from justice, provided the fact of the commission of the crimes charged against them shall be so established as that the laws of the court would justify their apprehension and commitment for trial "if the crimes had been here committed," but that it must appertain to the judicial tribunals to ascertain such fact, not but that the authority so to do resulted from their organization and appointment to take jurisdiction of all crimes and offences cognizable under the authority of the United States. It by no means is a necessary ingredient to the jurisdiction that the court or magistrate should have power to punish as well as arrest for the crime. Under the general authority, judges and magistrates take cognizance of offences charged upon a person; and if it appears that the crime was committed, or is properly triable in a different district, they remit the prisoner out of the jurisdiction of the arresting tribunals, to that within which the offence was committed. 1 Story's Laws, p. 66, § 33. Those compacts in the treaty so much dwelt upon in the arguments, as being in their nature merely executive acts, or engagements to perform future acts, are within the ordinary acceptation of the national contracts, and operate only upon the political power of the country. Contracts of that description cannot be always performed without the aid of legislation, either in this country or France. But the treaty also embraces the further provision, requiring the investigation of charges of crime, and the arrest and imprisonment of the accused as for trial; and in that respect, in this country, it drops the character of a contract merely, and assumes that of a municipal law addressed to the civil magistrates. The like provision in Jay's treaty was so accepted and acted upon. A judge of the United States took cognizance of the matter under authority of the treaty law alone. Soult v. L'Africaine [Case No. 13.179]; 1 Hall, Jour. Jur. 13; 5 Wheat. [18 U. S.] Append. 19. And no where, in the severe scrutiny the subject underwent, does it appear an objection was raised to the competency of the judge to arrest and commit by virtue of that law. Review of Proceedings by Marshall (afterwards Chief Justice), 1 Hall, Jour. Jur. 27. So other eminent judges have recognized a treaty as supplying all the law necessary to compel them to interfere and cause the apprehension of fugitives from justice. U. S. v. Davis and Ex parte Dos Santos [supra]. Without pursuing the argument further, I feel prepared upon these principles and authorities to declare that the duty devolves on me, under the authority of this treaty as a law of the land, to take cognizance of the requisition and charge laid before me.

The only remaining topic involved in the case of a strictly judicial character relates to the sufficiency of the evidence produced against the accused to authorize his apprehension and commitment. The evidence relied upon in support of the requisition consists in official documents transmitted from the keeper of the seal, minister of justice, in France, through the minister for foreign affairs, to the French minister in the United States, and by him delivered to the vice consul of France in this city, to be produced before the proper tribunal here. The oral testimony of two or three witnesses was also taken before me, auxiliary or supplementary to the documentary proofs. The counsel for the accused ground themselves, with strong assurances, upon objections to the competency of the documentary proofs, for the want of proper authentication, and because not originally taken in due form of law; and to the inadequacy of the oral evidence to justify his apprehension. It would prolong this opinion to an unusual extent to take up and consider consecutively the positions maintained upon these topics. I shall limit myself to stating general results, with the leading considerations tending to support them, and not attempt to discuss the particular points with fullness.

It will be proper first to notice the rules which in our law describe or fix the character or kind of evidence necessary on such preliminary proceeding, and the degree or amount of evidence required to support a charge of crime, and justify the apprehension of the accused and his detention for trial. Under our system of jurisprudence, no testimony is received on the trial of a criminal charge, unless delivered on oath, in presence of the accused; but a complaint or charge of crime may be made ex parte on affidavit, and one magistrate may act on depositions made before another, within or out of the jurisdiction of the examining magistrate, to issue his warrant of arrest, and commit the accused for trial. [Ex parte Bollman] 4 Cranch [8 U. S.] 129; 1 Chit. Cr. Law, 36, 37, note; 1 Burr's Trial, 12, 16. Nor need the evidence approach that full proof necessary to justify a conviction. The constitution requires no more than that probable cause be shown, to authorize an arrest (Amend. 6); and probable cause is deduced from a state of facts and circumstances, which afford reasonable grounds of suspicion of guilt (1 Burr's Trial, 11, 14, 16; [Ex parte Bollman] 4 Cranch [8 U. S.] 129; Barb. Cr. Law, 455, 492, 496; 4 Blau [by Chitty] 235). Dalton holds that a magistrate must commit when there is good ground for suspicion. Dalt. Ch. 166. Whether further proof must not be given to justify an indictment may be an unsettled question (Whart. Cr. Law, 125); but that does not arise for investigation in this state of the case. The testimony of the witnesses on deposition or orally before me might well authorize detaining the accused to give opportunity for additional proof, if not deemed sufficient to justify his absolute commitment for trial. 1 Burr's Trial, 16. The vice consul of France, Mr.

Borg, testifies that he has received official information from his government, that the accused stands charged with the crime of forgery of authentic deeds and instruments, committed by him in France in numerous cases in his capacity of royal notary, and also with forging of commercial and bank paper since November 9, 1843, and that he fled from justice of that country, and has taken refuge in this; and the witness has reason to believe and does believe such to be the facts. Mr. Karst proves his personal acquaintance with the accused at Sarreguemines in France, for many years, where the witness knew him, acting in the official character of a royal notary. Witness was defrauded by him in a transaction as notary of 20,000 francs. The accused absconded from France in February, 1844; and witness pursued him through Belgium, Prussia, and England to the United States. The accused traveled under a feigned name. He left a wife and child residing in France, and was charged with various crimes at the time he privately left there. Evidence creating a strong suspicion that a felony has been committed, and that it was perpetrated by a particular person, will warrant his apprehension without direct proof of the corpus delicti. 1 Burr's Trial. The report of the trial of Col. Burr, before Chief Justice Marshall, is referred to the more frequently for principles governing incipient proceedings in commercial cases because the questions were discussed by eminent counsel, and that distinguished judge gave every point a careful consideration, delivering his opinion upon them in writing.

Admitting the proofs of this class to be inadequate to justify the detention of the accused, I think the documentary evidence furnished by the French government is legally admissible. The counsel for the accused have reasoned this point on the assumption that the statute law of the state of New York supplies the rule of decision which the court must observe in this respect, under the direction of the judiciary act (section 34), and that these proofs are not authenticated conformably to the requirements of that law. Chief Justice Marshall decided that the section has no relation to criminal cases (1 Burr's Trial); and indeed it is a settled doctrine that the state laws do not ex proprio vigore affect the procedure of the United States courts, in any description of actions. [Wayman v. Southard] 10 Wheat. [23 U. S.] 1; [Bank of U. S. v. Halstead] Id. 51; [Beers v. Haughton] 9 Pet. [34 U. S.] 329; [Duncan v. Darst] 1 How. [42 U. S.] 304;. [Bronson v. Kinzie] Id. 323. It is not controverted but that the evidence might be so taken in France, pursuant to the laws of that country, as to be admissible in our judicatories to support charges of crime preferred under the treaty. Nor do I understand the objection raises any question touching the regularity of the proceedings, in the present case, before the juge d'instruction. His authority is clearly stated in the Code, and the method of procedure there indicated appears to have been carefully observed. Code D'Inst. Cr. arts. 70, 71, 76, par Rogron. The depositions were signed by the witness, the judge, and clerk at the same time, and the most commendable caution was exercised in making their contents clearly known to each witness, before they were completed. These documents are furnished pursuant to instructions of the secretary of state of the United States, to the French minister, on the 4th of December, 1844; and, unless the rule of law is imperatively so, they ought not to be subjected to a complete conformity with our usages, or those familiar to the common law, in all the formalities of authentication. All that can be reasonably exacted is that the documents offered as evidence on this preliminary inquiry shall be clothed with all substantial proof of verity. It is proper first to notice the method of verification adopted, and then consider its legal effect. The documents consist of the original mandat d'arret, issued against the accused by the judge of instruction, under the seal of the "cour civil d'instruction of Sarreguemines," and subscribed by him; and of copies of the depositions heard "dans la procédure instruite." The Procureur du Roi, for the department of Sarreguemines, made a requisition under his hand and official seal on the Greffier of the tribunal, to deliver a copy of the depositions taken in the matter, "certifiée conforme par lui." Dupin, the Greffier, adds to the depositions "pour copie conforme" delivered at the request of the Procureur du Roi, to which he subscribes his name, and affixes the seal of the tribunal. The chief of the bureau of the minister of justice and keeper of the seals, Laudy, certifies to the act of the Procureur du Roi, and of the Greffier "vu pour legalisation," of their respective signatures, and subscribes his name and affixes the seal of the bureau. The chief of the Chancellerié, De Lamarre, under the seal of the ministry of foreign affairs, and by authorization of the minister, certifies in the same form, to the signature of Laudy. Mr. Borg and Mr. Bartholemy (formerly an advocate in France), both examined before me, testify that the seals and certificates attached to these papers are the regular and accustomed methods of authenticating like documents in France, and that the seal of the ministry of foreign relations is the highest seal employed in France for these purposes. The French law books also speak of it as the great seal, and that it verifies public acts, &c., but distinguishes as le petit scel that which is affixed to judicial acts emanating from the royal jurisdictions. Dict. du Droit; Doinisart, Merl. Repert, voce, sceau, scel.

A procédure instruite before a tribunal in France has more the character and formalities of a trial than the proceedings under our laws before a magistrate on a charge of crime. The proceedings before a judge of instruction are to be enregistered, which is copying or

transcribing them on the minutes of the court. 10 Merl. Repert, 347, et suie. Whenever an expedition or copy is required by the proper authority (Code, par Baequar, p. 707, art. 7), une copie conforme is a copy collated or compared with the original, by the Greffier, and has all the characteristics of an exemplification from the record under our laws (Dict. de Droit; 4 Merl. Repert, 442, 443, arts. 1, 2; 6 Merl. Repert, 440, 443, Acts, v. 1, 4), and the certificate of the Greffier to that effect imports all that is demanded here to authenticate an exemplification of a record. So also the concise certificate of the keeper of the seals is equivalent to our expanded formulas. "Vu pour legalisation" signifies that the high functionary charged with that service has inspected the certificates, and found them legal in form and substance, containing every requisite to give them full credit and validity. Legalisation, c'est l'attestation que donne un officier public de la verité des signatures apposées à un acte, ainsi que des qualités des ceux qui l'ont fait et recu, afin qu'on y ajoute foi dans un autre pays. 16 Merl. Repert, p. 403; 3 Denisart, Coll. Jur. p. 85. A greater amplitude of phraseology would not have expressed with more distinctness, and certainly all the essential parts demanded of our law in such verification, and I am not aware that any set form of words is necessary in any system of jurisprudence. The fixed meaning of the phrase "vu pour legalisation" in the French jurisprudence gives to an authentication so made by the keeper of the seals all the weight of verification which can be attached to the acts of that high functionary. I hold then that these documents exhibit satisfactory evidence that the depositions were taken by the judge named therein in due form of law, and that he had competent authority to take them, and that exact and full copies are furnished from the appropriate court or minutes by a proper officer. And upon the strict rules of evidence obtaining in our courts, they are sufficiently authenticated to be received as evidence here. [Church v. Hubbart] 2 Cranch [6 U. S.] 187, 238; Wood v. Pleasants [Case No. 17,961]; 3 Cowen & Hill's Notes to Philips' Ev. 1123.

These facts are clearly proved by this evidence: That the accused was charged or "inculpé" with commission of forgery in France, in the exercise of his functions as notary, and in drawing up and executing acts or instruments appertaining to his ministry or official trust, and with forgery of commercial and bank paper, and with having made use of forged acts or instruments. The facts proved against the accused in support of these charges are that in repeated instances after the 9th of November, 1843, he prepared and had completed in his capacity of notary authentic deeds, by which various individuals pledged and hypothecated their property to secure alleged loans of money, and that the deeds declared the sums loaned and secured were at the time of making the deeds actually paid over in specie to the borrowers, and that two witnesses were then present, and signed the instruments or authentic deed, and that those declarations are false. It appears that by the laws of France these notarial acts become entitled to registry, and have similar force and effect with records of common law courts. Their verity cannot be impeached except for forgery. Baeque, Codes des Officiers Ministerials, p. 864, art. 19. Accordingly, the Code Penal denounces a falsification of these acts by notaries a forgery or faux, and subjects the guilty officer to infamous punishment (Code Penal, arts. 145–147), and also for making use of the forged acts or deed (article 148). The court of cassation, in exposition of the law, decided that a false declaration of the presence of two witnesses, on the execution of such notarial acts, is a forgery within the terms of article 146, as "constatant comme viais des faits faux." Explication de Code Penal, par Rojeor, p. 57. Official, notarial acts, being by the French system, the common mode of authenticating conveyances, devises and contracts of every description, the conduct of French officers would appropriately be brought under the severest supervision of the law. Notaries are officers of high dignity and confidence, appointed for life, and charged with the most delicate and important functions in respect to individuals and the public. They have always been as well antecedent to the compilation of the Codes, as since, subject to criminal prosecution for malversation in office. 3 Denisart, Coll. Jur. 434, 457; 21 Merl. Repert, 320–367. And it is therefore no way surprising that the transactions which under our Code might be only a misdemeanor, or malfeasance, rendering the officer liable to a civil action, should in France be visited with all the consequences of an infamous crime. I have accordingly no hesitation in declaring that the evidence before me amounts to probable proof that Metzger committed in France the crime de faux named in the treaty, and would justify his apprehension and commitment for trial therefor, if under our laws these acts had been crimes if committed here.

The topics already disposed of embrace all those legitimately belonging to the judicial authorities, to investigate and determine. The other points debated on this hearing are of a diplomatic character, and it is the province of the president, at least in the first instance, to decide them at his discretion. Whether the government is bound by the treaty compact to deliver up the accused, for offences committed by him in France which are not crimes by our laws, whether he is within the description of persons named in the treaty as subject to extradition, whether the treaty went into operation and became obligatory from its date or only from its ratification,

by assent of the senate or other period posterior to the date, and finally whether the obligations assumed by the treaty will be fulfilled or not, are considerations addressed to the political department of the government. Over these questions the judiciary has no immediate control or jurisdiction. The casus foederis of the treaty may be ever so manifest; yet, under the polity of our government, it in no way appertains to the judiciary to direct or contravene the action of the executive department in respect to it. The judicial authority can only be invoked incidentally and indirectly, to pass upon such provisions of a treaty; and it is only in that manner that acts of the president in execution of a treaty contract can be reviewed and adjudicated upon in courts of justice.

It seemed to be conceded in the Robins Case [Case No. 16,175] that a person under arrest for the purpose of being delivered up under the treaty with England, November 19, 1794, was entitled to the writ of habeas corpus, and the judgment of the proper tribunal whether the arrest was justified by law. That inquiry would probably also invoke the consideration of the competency of the executive authority to hold him in arrest, or deliver him over to be transported out of the United States. The English courts grant the writ in like cases (1 New Sess. Cas. 337); but, as already noticed, they proceed upon the principle that the extradition can only be made when authorized by act of parliament passed in execution of the treaty. If a writ of habeas corpus should be applied for in this case, the application must in the first instance, as the United States courts in this district are now constituted, be addressed to me; and, as the counsel on both sides have thoroughly examined every question connected with the subject, I deem it advisable now to pronounce my opinion, upon the entire case, that no other procedure may be taken with a view to any further action in the matter. I shall limit my attention to three propositions contended for in behalf of the accused by his counsel to be, if not clearly in his favor, yet that they place the authority of the executive over him, under the treaty, in so doubtful a light, as to entitle him to a discharge.

The first position is, that the true construction of the treaty in connection with the proviso to the first article is that a person is not subject to extradition unless the facts proved against him constitute in the country where he is arrested, one of the crimes in the treaty. In the present case I do not think sufficient evidence has been produced, to establish probable cause of suspicion that the crime of forgery defined by our laws has been committed by the accused. The exemption of the accused for this cause was urged with great confidence by his counsel, but the point does not impress my mind as resting upon a just exposition of the treaty, or demanding of me more than a brief statement of the reasons which prevent my acceding to that interpretation. The preamble expounds clearly the motives upon which the convention was founded. Each nation was desirous that malefactors should find no shelter in the territories of one, against punishment for crimes committed within the dominions of the other, and the high contracting parties manifest most unequivocally their intention to remove fugitives from their place of refuge in order to bring them within the operation of the laws they have violated. The purpose of each was to maintain the justice of their own country, and secure the sanctions of their laws within their respective dominions. To attain this object, the commission of the privilege is made mutual and reciprocal, each engaging to deliver to the justice of the other, persons who being accused of the crimes enumerated, committed within the jurisdiction of the requiring party, should seek an asylum or be found within the territories of the other. The terms employed in the treaty appear to me to carry out this purpose with a clearness and precision which scarcely admit of misconstruction. I should also infer that the proviso which is claimed to include the qualification urged in behalf of the prisoner was framed ex industria to avoid the construction sought to rest upon it. As in the body of it the observance of the laws of the place of refuge is exacted, in pursuing the apprehension and detention of the fugitive, it appears to have been thought expedient to mark by definite directions, that those laws were to furnish the method of procedure only, for it is declared that they shall be applied to the investigation abroad, as "if the crimes had been committed" where the arrest was made. The matter to be inquired into and adjudged obviously is, therefore, the fact of the commission of the crime charged, within the dominions of the party requiring the surrender of the fugitive; and accordingly the laws of France afford the basis of the inquiry in this case, and not those of the United States. If an ambiguity should be detected in the language used in these engagements, the fundamental doctrine applicable to all contracts would have its effect here, and the compact would be expounded according to the understanding and intent of the parties gathered from the whole convention; and their concurrent and subsequent acts in execution of it would be received as forcible presumptions of its true meaning. As already intimated, I am satisfied that the crime de faux, named in the treaty, was committed by Metzger in France; and he accordingly, in this respect, comes within the provisions of the treaty.

The further position taken for the prisoner that he does not come within the description of persons whose surrender the French government is entitled to claim under the treaty

rests upon questions strictly technical, artificial, and verbal, and involves no principles of general jurisprudence. It is, in effect, a question of procedure or practice properly referable to the special laws or usages of the French tribunals and authorities. The terms of the treaty are "les individus accusés," "les individus qui accusés," "les individus qui seront accusés," etc., and shall be delivered up to justice; and the point raised upon these expressions is that, by the French law, only a party "en accüsation" is "accusée" in the acceptation of the term in the Penal Code, and in the usages of the tribunals: and that accordingly his surrender cannot be demanded by the French government, or made by ours, until proceedings in justice inculpating or criminating him have been so far pursued that he is "mis en accusation,"— equivalent in our law to indicted or arraigned. Such, it is proved by Mr. Bartholemy, is the understanding of the term by the bar and courts in France; that "inculpé" and "prévenu" designate persons against whom criminal charges or proceedings are instituted up to the period they are acted upon by the Chambre de Conseil, and an accusation is decreed by it, and then, and not before, they become "accusée." Code d'Inst. Cr. acts, 127, 128, 241, 465. There may exist in France, from positive appointment of law, or usage, in respect to the term "accusée," an import in the idiom of the tribunals, different from what it bears in the literature of the language, and which it may be difficult for a foreigner to apprehend. It is a fact of common occurrence in the arts and professions for words to be diverted from their signification recognized by the literature of the language and familiar to the ear, and to acquire one entirely arbitrary in that relation; and, with my limited means of knowing the technicalities of a foreign forum, I shall carefully abstain from pronouncing upon the just force of this term in that application. It may not, however, be improper to notice, that Rojrou (article 91, Code d'Inst. Cr. notes) remarks on the subject, that usually (en général) a person is said to be inculpé when under a charge which may compel him to appear before the juge d'instruction; and prévenu, when he has been already subject to like orders; and accusée when remitted to the court of assizes by a decree of accusation. It would thus seem that the distinction in the dialect of the courts amounts to little more than a convenient distribution of phrases, and it is not an appellation fixed determinably by law. The French jurists note a difference in the use of the word "accusée" as a participle and a substantive; and, previous to the compilation of the Codes, it was only in the latter application, l'accusée, that it imported the party was decreed en accusation, whilst in the former sense it embraced both inculpé and prévenu, and denoted an individual complained or informed against for, or charged with, the commission of a crime. 1 Denisart, 38,

41, Dict. de Droit. The distionaries de Trevoux, (en avorat), Descenieres (Avocat), Mand of Chamband, Boyer, and the Academy, all note the same distinction. Since the adoption of the Codes, the usage has been more uniform to limit the term "accusée" to persons in accusation or indicted. 1 Merl. Repert Jur. Dist. de Droit. These verbal disquisitions are, however, a most unsatisfactory method of determining the import of language employed in a treaty designed to adjust international interests of high importance and gravity. The meaning of words not necessarily technical or professional (like the description of crimes) will be sought for in the general scope of the instrument, and the intention of the high contracting parties directly expressed or evinced by concomitant and subsequent acts. It is most manifest that the controlling purpose of the engagements was to render the advantages of the great principle fixed by the contracting parties, mutual and reciprocal to the fullest extent. Whatever privilege one acquired, he yielded the same in return to the other. There can be no doubt upon the contract with us, that the United States has the right to demand of France the surrender of persons charged or complained against, according to the provisions of the treaty, without regard to the state of prosecution in this country, or whether any has been instituted or not. Presenting a complaint with evidence to support it is a charge or accusation according to our laws, and it may be as well made in the first instance, before the French tribunals, as our own. The words "charged," used in the preamble, and "accused," in articles 1 and 2, are of the same import in that connection. The word "accusée" is in both instances adopted by the contracting parties as the concurrent and equivalent expression in the French language, and the meaning intended to be applied to the language at the time, must prevail in the construction of treaties equally with other agreements. The French government now formally demands the surrender of Metzger as being within the purview of the treaty, although he is not technically en accusation before the courts of that country, and the president of the United States avows his readiness to fulfill the engagement in that sense; and both the high contracting parties in this solemn manner signifying this construction and acceptation of the undertaking, I should not hesitate, even if an ambiguity attached to the language employed, to give it that force and effect. But having no doubt in my own mind, I should, independent of that solemn corroboration, of the exposition I give the treaty, declare that Metzger is a person accused of the crime of forgery committed in France, and in this view subject to the operation of the treaty.

The remaining consideration relates to the period at which the treaty took effect. The crimes proved against the accused were com-

mitted by him subsequent to the date of the treaty, but prior to its ratification by the president, with the advice and consent of the senate. It would be an useless labor to quote the opinions of foreign publicists on the question; or to spread upon this opinion in extenso the reasonings of American jurists, or the judgments of our judicatories, upon the subject. All that has been written abroad has been examined and discussed with great care and sagacity by our courts and jurists; and, in my opinion, the principle is conclusively settled, that a treaty is to be regarded as taking effect from its date, unless a different period is fixed by the contracting parties, or must be adopted in order to fulfill their manifest intention. It must necessarily be, in effect, a question of intention, and the public law, the same as municipal, implies the intention of the parties to be, when not defined by themselves, that these contracts shall have effect from the time of their execution. 1 Kent, Comm. 169; Whart. Int. Law, 306; 2 Elliot, Dip. Code, 409, 410; Beale v. Pettit [Case No. 1,158]; [U. S. v. Arredondo] 6 Pet. [31 U. S.] 757. The principle is the same when the contract is entered into through the intermediation of agents, and their acts are to await confirmation or ratification by their principal before becoming complete, for it is a maxim of the law that "omnis ratihabitro retrotrahitum," and the obligation goes into force as if perfected at its formation. Moreover, this, like other arrangements between the parties, is to be interpreted and carried into effect, conformably to the purpose disclosed in the terms of the contract, or derived from other evidence. The 5th article by prohibiting the operation of the treaty anterior to the date affords a violent presumption that the parties contracted with the understanding and intent that it should take effect at its date, and this interpretation is furthermore assented to and acquiesced in by their proceedings on this application. Both parties insist that the treaty is obligatory from the time it was signed; and although such act of the parties cannot avail to the prejudice of others, whose rights are affected by the treaty, yet it is a circumstance entitled to be regarded on an inquiry with the motives which governed the creation of the compact.

The result of my reflection upon the entire subject is that if the president in his discretion determines the casus foederis of the treaty exists, and that Metzger ought to be delivered up to the French government, there is nothing shown in this case which entitles him to the interference of the judiciary, to prevent the decision of the president being carried into execution.

[NOTE. Metzger then moved in the supreme court for a writ of habeas corpus. The motion was overruled. Mr. Justice McLean delivering the opinion of the court. He held that the court had no jurisdiction to issue the writ for the purpose of reviewing the decision of the district judge. 5 How. (46 U. S.) 176.]