## In the matter of NICHOLAS LUCIEN METZGER.

The president of the United States has no authority, by virtue of mere treaty stipulation, and without an express enactment of the national legislature, to deliver up a resident of this country to a foreign power.

Upon the principles of the common law, a treaty does not execute itself; nor can the courts act under it, for the purpose of enforcing its provisions, except in pursuance of a statute.

The provision in the constitution of the United States which declares that the constitution, and the laws made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land, does not, *ex proprio vigore*, and without legislative enactment, confer upon the officers of the national government the power of executing the stipulations of a treaty.

Where a treaty contains a provision importing a contract that its terms shall, at some future period, be ratified and confirmed, such treaty does not execute itself; but it must be executed by an act of congress, before it can become a rule for the decision of the courts.

Where the treaty is a contract to be performed *in futuro*, the courts have no power, except under the statute; and if the provisions of the statute are not clearly complied with, they have no power at all, in the matter.

The treaty of 1843, between the United States and France, cannot, in any sense, be held to execute itself. It was not intended to act *in præsenti*. It was a contract between the two nations to be executed only *in futuro;* and it stipulated for future legislation. Without such legislation the courts have no power to act, in executing the treaty.

Although that treaty may be regarded as executing itself, so far as to establish the right of the French government to the surrender of a criminal, legislation is required to enforce the delivery, and secure the subsequent possession, of the fugitive.

And the want of such legislative sanction is not mere matter of form. It is a substantial right; and involves too deeply the liberty of the citizen to be dispensed with.

In cases of this nature state magistrates have no original authority.

In the matter of Metzger.

Nor has a district judge of the United States, at chambers, any power to aid in carrying a treaty into effect; in the absence of any provision of the constitution, of the treaty, or of the statute, conferring the power upon officers of that description.

The mandate of the president of the United States commanding the marshal to surrender a prisoner to the diplomatic agents of a foreign government, under the provisions of a treaty, is not conclusive. Upon a writ of *habeas corpus*, the legality of the foundation on which such mandate rests may be inquired into.

Where a treaty was drawn up in the French as well as in the English language, and both parts were originals, and were intended by the parties to be identical, but the French counterpart varied from the English in certain particulars; *Held*, that if both parts could without violence be made to agree, that construction ought to prevail which would establish a conformity between the two parts.

A prisoner who has been merely charged, or accused, before a magistrate in France authorized to arrest, is not a party accused—*mis en accusation*—within the meaning of the treaty of 1843 between the United States and France. And he cannot be demanded by the French government, nor surrendered by the American, by the terms of that treaty.

The president cannot execute the power of extradition, under that treaty, without both legislative and judicial sanction, previously obtained.

THE prisoner was a notary public in one of the departments of France, which country he left and came to this state. After he had left his residence, it was charged against him that he was a defaulter to his clients to a large amount, for moneys of theirs which he had embezzled, which embezzlement he had attempted to conceal by means of forgeries. Complaint to that effect was made against him, before a French committing magistrate, who issued a warrant for his arrest. He was not, however, apprehended on the warrant, but the papers, duly authenticated, were transmitted to this country, and the French minister demanded his surrender under the treaty with France of 1843. That functionary was referred by the secretary of state to the courts or magistrates of the country, and he accordingly made application to one of the police magistrates of New-York for a warrant, on which Metzger was arrested. An examination was had before that officer, who adjudicated that the prisoner was within the treaty, and issued his warrant committing him to prison until the president of the United States should demand him. Before that demand was made, the prisoner was taken before the circuit judge of the first circuit on habeas corpus. That officer decided that the police magistrate had no

In the matter of Metzger.

jurisdiction in the matter, and that the prisoner was entitled to be discharged from that commitment. The French diplomatic agent then made application to the United States district judge, before whom similar proceedings were had ; which resulted in a similar adjudication, and a like warrant of commitment. Application was then made to the supreme court of the United States for a writ of habeas corpus to review the action of the district judge. The application was denied, on the ground that that court had no power to review the action of a district judge at chambers.

Thereupon the president of the United States issued his mandate to the marshal of New-York, commanding him to surrender the prisoner to the diplomatic agents of the French government. Before, however, the surrender was actually made, a writ of habeas corpus issued, directed to the marshal, returnable before Edmonds, Circuit Judge. The matter was twice argued before him, and under the judiciary act of 1847 was transferred from him as circuit judge to him as judge of the supreme court under the new constitution.

*N. B. Blunt & Ogden Hoffman*, for the prisoner, demanded his discharge for the following reasons. 1. That the crime alleged was committed between the signing of the treaty and its ratification, and was not therefore within its operation. 2. That the prisoner had been only charged with the offence, and not indicted ; that he was *inculpè* and not *accusè*, and therefore not within the treaty. 3. That the president of the United States had no authority to act in the matter until congress had provided by law for the execution of the treaty. 4. That the federal judiciary had no power to arrest, examine, or commit, except under a statute ; and as no statute had been passed, there were no means provided by government for executing the treaty. 5. That the act charged is not a crime under our laws, and therefore not within the treaty. 6. That the president's mandate is not conclusive, but its foundation may be inquired into, and be impeached.

*In the matter of Metzger.*

*B. F. Butler*, (U. S. district attorney,) for the United States.
I. It appears from the marshal's supplemental return, and it is
conceded by the replication, that the prisoner is held in custody
by virtue of the president's mandate, for his surrender to the
authorities of France, as a fugitive from the justice of that
country within the meaning of the convention of the 9th of
November, 1843. II. The validity of this mandate is therefore
the only question now to be decided, though in order to its de-
cision, it is proper to look into the provisions of the treaty, the
orders of Judge Betts contained in the return, and the evidence
presented to and taken before him, and transmitted by him to
the state department; for the purpose of ascertaining whether
they authorize the action of the president. III. The treaty,
although not previously obligatory on either of the contracting
parties, became, upon the exchange of ratifications, a part of
our supreme law. And by its true construction it authorizes
and requires the surrender of fugitives from the justice of either
party, found within the territories of the other, who at any
time after the 9th of November, 1843, are duly proved to have
committed any of the crimes enumerated in the treaty. This
construction does not render the provision liable to objection as
an *ex post facto* law, within the meaning of the prohibition of
such laws in the constitution of the United States; because—
1. The prohibition referred to, if it can be extended to cases
arising under *treaties*, can only apply to cases within, and per-
sons amenable to, *the jurisdiction of the United States.*
2. The treaty neither *creates* the crime nor increases its *pun-
ishment.* If it alters the situation of the criminal, it does so
only in respect to the *remedy ;* and, under our constitution such
laws are valid. IV. The treaty being part of the supreme law,
addressed to the judiciary as well as to the executive, Judge
Betts had competent authority, upon the complaint and affida-
vit laid before him, to issue his warrant for the arrest of Metz-
ger, and to inquire into and decide upon the subject matter of
such complaint. This authority was duly exercised by him in
the order committing Metzger to the marshal, to abide the

In the matter of Metzger.

order of the president; and his decision conclusively sustains that order. It is *res adjudicata.*

V. The validity of the president's mandate does not necessarily depend on the question, whether or not Judge Betts had jurisdiction; and whatever may be the true answer to that question, yet as the third article of the treaty (differing in this respect from all our prior treaties of this nature,) *expressly* provides that the surrender shall be made by the president, and as the president in this case has made an order to that effect, his mandate must be deemed lawful, and should be executed; provided it be found, on looking into the evidence, that Metzger is, within the meaning of the treaty, a fugitive from the justice of France, whose surrender is duly demanded by the government of that country. VI. It appears by the return of the marshal, and the evidence, that Metzger is such fugitive, and that his surrender is so demanded. 1. The word " *accusé*" in the French side of the treaty, is to be understood in its general sense, and as equivalent to the English word " charged," by which it is twice rendered in the English side. 2. The proofs annexed to the affidavit of Mr. Borg, are properly authenticated to be read as evidence, and by them it appears, that Metzger has been charged with, and accused of having committed, in France, since the date of the treaty, the crime of *forgery,* as defined and denounced in the French penal code. 3. It is not necessary that the forgery with which the prisoner stands charged, should also constitute the crime of *forgery* as defined in the acts of congress, or by the law of New-York. 4. The government of France, through its proper diplomatic agents, has demanded his surrender from the executive of the United States.

VII. The mandate of the President being fully warranted by the provisions of the treaty, and the facts of the case, the prisoner should be remanded to the custody of the marshal.

EDMONDS, J. This case involves the question whether the president of the United States has authority, by virtue of mere treaty stipulation, and without an express enactment of the national legislature, to deliver up to a foreign power, and virtually

In the matter of Metzger.

to banish from the country, an inhabitant of one of the sovereign states of our confederacy. The importance of the question has weighed heavily upon me during the whole time that the case has been before me. The right is claimed, and has been exercised, by that high functionary in this instance ; its exercise is demanded by the French government in the name of the treaty between the two nations, and a branch of the federal judiciary has sanctioned it.

Amid this imposing array of power against him, the prisoner, a resident among us and entitled to the benefit of our laws, has thrown himself for protection upon state sovereignty, and demanded the interposition of its authority between him and the exercise of this extraordinary power. To that protection he has a right, in common with every inhabitant of our state, and it becomes my duty, as one of the state judiciary, to see that he sustains no injury in the exercise of this power.

The apprehension that out of the discharge of this duty there might spring a conflict between national and state authority has not been without its influence on my mind, causing me to pause long, and weigh well any decision which I might make. Presenting to my mind, as this case does, the picture of the whole power of the nation claiming and enforcing the surrender of the individual on the one hand, and personal liberty demanding protection against the exertion of extraordinary power on the other, I have not been free from anxiety as to the conclusion at which I might arrive, and the consequences which might flow from it.

The question is, in a great measure, under our institutions, anomalous; arising out of that peculiar provision of our national constitution which declares that all treaties made under the authority of the United States shall be the supreme law of the land. But for this provision, and the construction claimed for it, the question might justly be regarded as already settled by authority. The British government, in February, 1843, made a treaty with France, identical in this regard with the convention between France and the United States. The British administration and the British parliament did not deem that the con-

vention executed itself, or that it could be executed without legislative enactment. Hence the statute 6 and 7 Vict. c. 75 was passed, which recited this clause of the convention, and declared that it was expedient that provision should be made for carrying it into effect, and then enacted that any justice of the peace, or other person, having power to commit for trial persons accused of crime, &c. might examine witnesses and issue his warrant to apprehend the alleged fugitive, and commit him to jail until delivered pursuant to the requisition. Under this statute the lord mayor of London, in September, 1844, issued his warrant for the arrest of an alleged fugitive from France, who, on being arrested, was brought before the Queen's Bench on habeas corpus. That court held the warrant void, and on being applied to for the purpose of remanding the prisoner, as a person accused under the treaty, they denied that they had any power but under the statute, and decided that if its provisions were not clearly complied with they had no power at all in the matter. (*In re Bessett,* 1 *New Sess. Cas.* 337.) Here then is a decision that, on the principles of common law, the treaty does not execute itself, and that even the highest judiciary in the nation could not act under it but in pursuance of a statute. And this exposition flows not only from the British courts, but from the British executive and the British legislature.

I know of nothing except the provisions of the constitution of the United States to which I have alluded, which can exempt our courts from the binding force of the same doctrine, when they and the English courts alike draw the principles of their action, and the rule and guide of their judgments, from the same fountain of the common law. Hence arises the necessity, in this case, of considering the meaning and force of this constitutional provision, and of inquiring how far it does, *ex proprio vigore,* and without legislative sanction, confer upon the officers of the national government the power of executing the various matters to which it relates. In the first place it must be observed that the provision in question does not relate to treaties alone. It is the constitution itself and the laws of the United States, which shall be made in pursuance thereof, and all trea-

In the matter of Metzger.

ties made or which shall be made under the authority of the United States, which shall be the supreme law of the land. (*Const. art.* 6.) If this provision has this self-acting power in regard to treaties, it has it equally in regard to the constitution at large; and from this consideration we may well appreciate the magnitude and interest of the question involved.

What is the meaning of the supremacy here provided for? That the power is itself omnipotent—self-acting and self-dependent alone—and that the functionary clothed with it, if perchance he be the executive, is in that regard beyond the control alike of the judicial and legislative departments of the government? Such must be the result, if that provision does give, as is claimed in the argument before me, to the constitution and to treaties this self-sufficing authority. But such, as I understand it, is not the true reading of this provision. The 22d No. of the Federalist defines its purpose in language more felicitous than any which I can use:

" The treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import as far as respects individuals must, like all other laws, be ascertained by judicial determinations. To produce uniformity in these determinations, they ought to be submitted, in the last resort, to one supreme tribunal." 　*　　*　　*　　" If there is in each state a court of final jurisdiction, there may be as many different final determinations on the same point as there are courts." 　*　　*　　*　　" To avoid the confusion which would unavoidably result from the contradictory decisions of a number of independent judicatories, all nations have found it necessary to establish one tribunal paramount to the rest, possessing a general superintendence, and authorized to settle and declare in the last resort a uniform rule of civil justice." 　*　　*　　*　　" The treaties of the United States under the present constitution are liable to the infractions of thirteen different legislatures and as many different courts of final jurisdiction."

Hence arose the establishment of a supreme judicatory, not that it should be omnipotent and self-sufficing in its power, but

In the matter of Metzger.

that, within its sphere, it should be paramount to all other judicatories. Hence, too, the provision in question, that the constitution, the laws made in pursuance of it, and the treaties, should be the supreme law ; not that they should be omnipotent and self-sufficing in their authority, but that they should be paramount over all other authority, so that, if when duly executed, they should come in conflict with any other, they should be supreme and paramount. This is no novel doctrine. But as I read the history of our country, it has prevailed from the beginning, though not now for the first time questioned. In the celebrated case of Jonathan Robbins, Chief Justice Marshall, then a member of the house of representatives, asserted the same claim which is put forth for the government in this case. But he went farther and followed the doctrine out to its legitimate results, by insisting that the case was one for executive and not judicial decision, and that the judicial power cannot extend to political compacts, such as the case of the delivery of a murderer under the 27th article of Jay's treaty with Great Britain. (5 *Wheat. App.* 16.) In several instances, however, and at different periods, congress has, by its action, given a different construction to this provision of the constitution. A few instances will suffice.

The constitution, art. 3, § 2, declares that the judicial power shall extend, among other things, to all cases affecting ambassadors, other public ministers and consuls, and that in those cases, the supreme court shall have original jurisdiction. It might well be supposed, that if any power in that instrument, which is to be the supreme law of the land, could be thus self-acting ; it would be the power thus explicitly conferred. Yet, in the judiciary act of 1789, § 13, congress provides for the exercise of this jurisdiction both for and against ambassadors and other public ministers. So, too, the constitution, art. 4, § 2, provides that fugitives from justice shall, on demand of the executive of the state from which they have fled, be delivered up to be removed to the state having jurisdiction of the crime. This provision also of the supreme law of the land, might be supposed to execute itself, yet congress in 1793, passed a law upon

the subject, in order to carry it into effect. The origin of this law is a striking illustration of the interpretation which prevailed at those early days. It grew out of a demand made by the governor of Pennsylvania upon the governor of Virginia for the surrender of a fugitive from justice. With that demand the executive of Virginia refused to comply, for one reason, among others, because congress had not passed any statute to execute this provision of the supreme law of the land. The opinion of the attorney général of Virginia assuming that position, and the reply of the executive of that state sanctioning it, were communicated to congress by President Washington in October, 1791, and out of that state of things flowed the statute which has for more than half a century governed the whole action of our citizens in that regard. (*American State Papers, vol.* 20, *p.* 38.) If the claim now asserted is well founded now, it was so then; and if well founded, then indeed were this statute and that also which came into existence at the same time in regard to fugitives from service, works of idle supererogation on the part of congress.

So, also, the same article of the constitution provides that persons held to service or labor in one state, escaping into another, shall be delivered up on claim of the party to whom such service or labor may be due. This provision, too, of the supreme law, so far from executing itself by virtue of its supremacy, is helped out, and carried into effect, by the same law of congress, and sprung from the same necessity for legislative action which was then conceded. So, too, the article of the constitution, (*Art.* 2, § 3,) which declares it to be the duty of the president to take care that the laws be faithfully executed, is helped out and carried into effect by the act of 1795, which gives him authority to call out the militia to suppress insurrection in any of the states. These are all provisions of the constitution—the supreme law of the land—which congress at an early day deemed it necessary to legislate upon, for the purpose of carrying it into effect. And it may well be asked why this necessity, if this supreme law was, by virtue of its supremacy, self-sufficing, and did execute itself without legislative interposition?

In the matter of Metzger.

Such has also been the action of congress and the interpretation of the national government in relation to our treaties; which are also the supreme law. In 1788, a convention was entered into between France and the United States, providing for the arrest and surrender of deserting seamen, in which it is provided that for that purpose the consuls shall address themselves to the courts, judges and officers competent, and demand said deserters in writing, &c. And all aid and assistance to the said consuls shall be given for the search, arrest and seizure of said deserters, who shall be kept and detained in the prisons of the country, &c. In 1824 a similar treaty was made with the republic of Colombia, and from that time down to 1845, various treaties with nations in Europe, Asia and America have been made containing the same provision as to deserting seamen.

Specific as is this provision in these various treaties—pointing out as it does even the manner in which the power shall be exercised—congress and our government have been so far from regarding it as capable of executing itself, that in 1829 a law was passed in language scarcely more particular than the various treaties, providing for carrying them into effect.* A marked instance of a similar character is of more recent occurrence. We have a treaty with Spain, providing against privateering, and declaring that if any person of either nation shall take a commission as privateer, or letters of marque, he shall be punished as a pirate.

Yet congress and our government did not regard this treaty, though the supreme law of the land, and distinctly defining the offence as piracy, and thus bringing it clearly within the jurisdiction of the federal courts, as sufficient to execute itself; but on the 3d of March, 1847, passed a law in the following words:

*An act to provide for the punishment of piracy in certain cases.*

Be it enacted, &c. That any subject or citizen of any foreign state who shall be found and taken on the sea, making war

---

* This act is understood to owe its origin to the fact that so distinguished a jurist as Judge Story refused to execute one of these treaties until congress had legislated on the subject.

In the matter of Metzger.

upon the United States, or cruising against the vessels and property thereof, or of the citizens of the same, contrary to the provisions of any treaty existing between the United States and the state of which such person is a citizen or subject, when by such treaty such acts of such persons are declared to be piracy, may be arraigned, tried, convicted and punished before any circuit court of the United States, for the district into which such person may be brought, or shall be found, in the same manner as other persons charged with piracy may be arraigned, tried, convicted and punished in said court. (Approved March 3, 1847.)

So far as the supreme court of the United States have acted on this question, they seem to have adopted the same principle. In *Foster* v. *Neilson,* (2 *Peters,* 314,) they declare that a treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished ; especially so far as its operation is infraterritorial, but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature whenever it operates of itself, without the aid of any legislative provisions. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not to the judicial department, and the legislature must execute the contract before it can become a rule of court. And speaking of the particular treaty then under consideration, they add, " This seems to be the language of contract, and if it is, the ratification and confirmation which are promised, must be the act of the legislature. Until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject." In the *United States* v. *Arredondo,* (6 *Peters,* 734,) that court affirmed the same doctrine, and again speak of a treaty which is a contract between two nations, the stipulations of which must be executed by an act of congress before it can become a

In the matter of Metzger.

rule for their decision. These two cases involved the treaty with Spain of 1819, and they grew out of the words used in it, that certain grants "shall be ratified and confirmed." The court held that if these words imported that these titles " are hereby ratified and confirmed," then the treaty, by virtue of its being the supreme law, operated *per se* to ratify and confirm; but if they imported a contract that they should at some future period be ratified and confirmed, then the treaty did not execute itself, but it must be executed by an act of congress before it could become a rule for the decision of the courts. In other words, where the treaty is a contract to be performed *in futuro*, the English rule as laid down by Lord Denman, in 1 *New Session Cases*, is applicable, the courts have not any power but under the statute, and if its provisions are not clearly complied with, they have no power at all in the matter. The supreme court of the United States a third time, in reference to those words, reiterate the doctrine. In the *United States* v. *Pescheman*, (7 *Peters*, 87,) Chief Justice Marshall says that although the words " shall be ratified and confirmed " are properly words of contract *stipulating for some future legislative act*, they are not necessarily so. They may import that they shall be ratified and confirmed by force of the instrument itself.

In the latter signification of the terms, in a country where the treaty is the supreme law of the land, it may perchance be well said that the treaty executes itself. But this provision in the convention with France under which this prisoner is held, can in no such sense be held to execute itself. It never was intended to act *in presenti*. It was a contract between the two nations to be executed only *in futuro*, and in the language of principle, of the action of congress and the decisions of the federal judiciary, it stipulated for future legislation, without which, as the Queen's Bench declares, the courts have no power at all in the matter.(*a*)

(*a*) In the case of *The British Prisoners*, (1 *Wood. & Minot's Rep.* 66,) it was decided in the circuit court of the United States for the first circuit, that under the treaty with *Great Britain* of August, 1842, persons charged with piracy, committed contrary to acts of parliament, and on board a British vessel, may be arrested here,

In the debate in congress on the Jonathan Robbins matter, it was stated that President Washington had entertained doubts whether the extradition clause in Jay's treaty could be executed without legislative action. And in 20 *Serg. & Rawle*, 135, the supreme court of Pennsylvania express the same doubt, and declare that the opinion of the executive hitherto had been that it had no power to act. In the case of *Prigg* v. *Commonwealth of Pennsylvania*, (16 *Peters*, 624,) the provision of the constitution as to the surrender of fugitives from service was under consideration. Story, J. in delivering the opinion of the court, speaking of that clause which enacts that the fugitive shall be delivered up on claim of the party to whom such service may be due, says, " We think it exceedingly difficult, if not impracticable to read this language and not to feel that it contemplated some farther remedial redress than that which might be administered at the hands of the owner himself. * * * They require the aid of legislation to protect the right, to enforce the delivery, and to secure the subsequent possession, of the slave." And the court in this case, in adjudicating upon language very similar to that contained in the treaty, declare that the constitution does execute itself, so far as to establish the absolute right of the owner to recapture his slave, but that to enforce the right the aid of legislation is required. And by parity of reasoning, while we may regard this treaty as executing itself so far as to establish the right of the French government to the surrender, legislation is required to enforce the delivery, and secure the subsequent possession, of the fugitive.

The want of this legislative sanction on which so much stress is laid, is not mere matter of form. It is a substantial right,

and surrendered without any special act of congress to carry that treaty into effect. But Mr. Justice Woodbury, who delivered the opinion of the court in that case, places the decision upon the ground that no act of congress was necessary under that treaty; the act to be done being chiefly ministerial, and the details unusually full, in the treaty. And he observes that if a treaty stipulated for some act to be done, entirely *judicial*, and not provided for by a general act of congress, it could hardly be done without the aid, or preliminary direction, of some act of congress prescribing the court to do it, and the form.

In the matter of Metzger.

and involves too deeply the liberty of the citizen, to be dispensed with. Treaties by our government are made by the executive, without the sanction of the legislature. The extradition provided for by this convention with France is not confined to the subjects of France. An American citizen may be demanded by the French government, and our executive may on such demand, banish a native of our soil—nay, if one, then hundreds. And it becomes us well to see that, power so great should be properly guarded.

There is another consideration flowing from this view of the case. Neither the constitution, the laws, nor the treaty, which together constitute the supreme law as to this case, provide for the interposition of the judiciary in the exercise of this power. On the other hand the treaty provides that on the part of the United States the surrender shall be made only by the authority of the executive thereof. And although the executive has, in this case, with great propriety, invoked the aid of the judiciary, yet he has done it in such manner that the decision of the subordinate tribunal appealed to, cannot be reviewed in the court of dernier resort and therefore becomes final. And if the right claimed in this case for the executive to act in the matter without legislative sanction be once firmly established, I cannot discover any provision in the supreme law which renders it necessary for him to seek the aid of the judiciary. It may be convenient for the executive to resort to the machinery of the judiciary, or the incumbent for the time being may entertain such a sense of duty as to induce such a resort; but the right once established as now claimed, it must necessarily become a matter of discretion with the executive, whether he will require the assent of either the legislative or judicial departments to his surrendering to a foreign government any person, native to the soil, or immigrant, whom it may please to demand as a fugitive from justice.

In the absence of any statutory provision, the executive can resort, for the rule of its action, only to the treaty. The treaty with France no where provides for a resort to the judiciary. It declares that persons accused of crime shall be delivered up,

In the matter of Metzger.

provided that this shall be done only when the fact of the commission of the crime shall be so established, as that the laws of the country would justify their apprehension and commitment for trial. How established, and before what tribunal? It is the executive alone who can surrender, and if the treaty alone is to be the guide of his action, then when he becomes satisfied that the commission of the alleged crime is established, whether that be with or without the aid of the judiciary, he can surrender. Such is the claim presented before me, and, if established, then is the liberty of the citizen, at least as respects extradition, subjected to executive discretion to an extent that is calculated to alarm even a country where freedom in the aggregate is so common that its invasion in detail is too often and too easily disregarded. To meet an objection so formidable in its character, it is urged that the aid of the judiciary must of necessity be invoked in the execution of the treaty.

I have already had occasion to decide in this case that the state magistrates have no original authority in the matter.(*b.*) Not having seen any reason for changing my opinion, and that opinion having been acquiesced in by all parties concerned in this matter, that must be regarded as *pro tanto* the law of this case. The remaining question then is, whether any of the federal magistrates have the authority? The question may well be put still broader, and comprehend not merely the inquiry whether the federal judiciary may entertain jurisdiction, but also whether it ought not to be the duty of the government, and the right of the prisoner to make the appeal to them. I will not stop, however, here to consider that question, but pass at once to the simple topic of the authority of the federal magistrates, voluntarily or otherwise, to act in the matter. And this topic need not be discussed any farther than to the extent

(*b*) In the case referred to in the preceding note, it was held that under the *British* treaty, persons charged with offences contrary to acts of parliament may be examined, and if believed guilty, be ordered into custody with a view to a future surrender. And that this may be done by a magistrate of a state; though such magistrate is not compellable to do it, by the United States.

and as to the manner in which the authority has been exercised in this case.

It must then be observed in the outset, that the action on which the prisoner was committed, was not the action of any court, but of a district judge as such. The arrest, examination, and commitment were none of them the act of the district court, but of the judge, as such, at chambers, or as committing magistrate. It is important to keep this fact in mind, as it was one of the main grounds on which the United States supreme court refused to this prisoner his application for the writ of habeas corpus; and it brings us to the real question in this case, whether a district judge, not sitting in court, has the power to aid in carrying a treaty into effect. Marshall, in his speech in the Robbins case, repeatedly denied the authority of the judiciary in every form. That was the second proposition he maintained; (5 *Wheat. App.* 16;) which was that the case was a case of executive and not judicial decision. He proceeded to refute the position of Mr. Livingston, that the judicial power of the United States expressly included that under consideration. He maintained (page 77) that the judicial power cannot extend to political compacts, as the establishment of a boundary line, &c., or the case of the delivery of a murderer, under the 27th article of our present treaty with Britain; and he proceeded with this language: "The gentleman from New-York has asked, triumphantly asked, what power exists in our courts to deliver up an individual to a foreign government? Permit me, said Mr. Marshall, but not triumphantly, to retort the question. By what authority can any court render such a judgment? What power does a court possess to seize any individual and determine that he shall be adjudged by a foreign tribunal. Surely our courts possess no such power. Yet they must possess it, if this article of the treaty is to be executed by the courts." And he concluded with the remark, "The case was in its nature a national demand, made upon the nation. The parties were the two nations. They cannot come into court to litigate their claims, nor can a court decide on them. Of consequence, the demand is not a case for judicial cognizance." Again, (on page

In the matter of Metzger.

28) he says, It is then demonstrated that according to the practice, and according to the principles, of the American government, the question whether the nation has or has not bound itself to deliver up an individual charged with having committed murder or forgery within the jurisdiction of Britain, is a question the power to decide which rests alone with the executive department. The inference from that debate and its results, is as fair, perhaps, as any other, that the majority of congress who went with him on that occasion, and in the language of Judge Story, "put the question at rest and forever," intended to sustain that as well as the other principles which he then advanced. Mr. Marshall maintained that, a treaty providing for the surrender of fugitives being made, the executive was competent of itself, without judicial or legislative aid, to execute it. How far he is competent without legislative aid, has already been shown from authority, upon principle and by the action of the government for 50 years. And the United States supreme court, in the case of *Holmes* v. *Jenison*, (14 *Peters*, 540,) and more recently on the application of Metzger for a habeas corpus, have recognized the necessity of judicial action.

But then the questions recur, whence do the judiciary derive their authority to act in the matter? Who is to set them in motion, and what is to regulate and control the form and manner of their going? And how are the rights of the accused to be protected? These are important questions under our state constitution, which declares that no man shall be deprived of any of the rights or privileges secured to him, unless by the law of the land, or the judgment of his peers.

The learned judge, upon whose warrant the prisoner was committed, evidently has strong doubts upon this subject, though he thinks them capable of a satisfactory solution. But the solution which he discovers is applicable only to courts of the United States, not to the judges acting out of court; and he seems to have overlooked the distinction which the supreme court have since rendered so important, as on that ground alone to deny to the prisoner the privilege of having his case reviewed in the federal courts. Under that decision, I am not at liberty

to disregard so grave a distinction, and am compelled to inquire, if, perchance, the courts have the power, does it follow that the judges out of court possess it also ?   If so, whence does it flow ? Not from the constitution, for that is silent on the subject—not from the treaty, for that is equally silent—not from any express statutory enactment, for the want of that has been throughout the whole case the great ground of complaint—and not from necessary implication from any power otherwise granted.   It seems to me, then, that it can trace its origin to no other source than the necessity or convenience of the case.   When we are brought to this point, then, the whole course of reasoning on which was founded my decision, that the police magistrate acted without authority, becomes equally applicable to the district judge.   In the absence of any provision of the constitution, of the treaty, or of the statute, conferring the power upon that officer, I am compelled, by the view which I then took of the case, and which was acquiesced in on all hands, to arrive at the same conclusion as to his power.

It is with unfeigned diffidence, and after long consideration, that I have imbibed a view of this case, so different from that entertained by the learned judge whose decision I am compelled, from my position, thus to review.   His long experience, and the high respect which I entertain for his judicial character, might have inclined me to yield my own conviction to his, if his own opinion of the power of the United States court had been clear and decided, or if he had at all considered the power of a judge out of court; a distinction, I repeat, which has been rendered important by the subsequent decision of the supreme court of the United States.

There is another view of the case which has had its weight with me, and that is the mode of reviewing the decision of one of the federal judiciary, which is thus brought about.   Such review is not ordinarily through the state tribunals, yet I see no way in which it can be avoided in this case.   I was bound by the law of the sovereignty whose minister I am, under severe penalties, to allow the writ of habeas corpus.   It was to the prisoner, under our laws, a writ of right.   The United States

In the matter of Metzger.

supreme court having denied to him the privilege of carrying up the decision of the district judge directly for their review, he had a right to resort to the state tribunals as the conduit through which he can more indirectly pass to that ultimate tribunal, whose peculiar province it is to pass upon all questions arising under treaties made by the authority of the United States. The writ being returned before me, it was my duty to inquire into the cause of the prisoner's detention, and that not merely as it appeared on the warrant by which he was held, but as it might appear from any fact alleged before me, to show that his imprisonment or detention was unlawful, or that he was entitled to his discharge. (2 *R. S.* 569, § 50.) I have therefore, of necessity, gone behind the mandate of the president, and inquired into the legality of the foundation on which it rested. And finding it to be wanting in legal aliment necessary to support it, I have no alternative but to declare that the prisoner cannot lawfully be held under it.

It will be observed that I have in this opinion omitted to discuss many of the points raised before me on the several arguments, which have been had in the case. This omission has not arisen from any want on my part of attention to, and careful consideration of them, but solely from the belief that their discussion was not necessary to the determination of the case, on which I was to render my judgment. There is, however, one topic, on which I differ in opinion with the learned district judge, which strikes me with so much force that I cannot forbear dwelling a moment upon it. The Spanish treaty, which has been already alluded to, contained a stipulation as to the ratification and confirmation of certain grants of land therein mentioned. The English side of the treaty contained, in that regard, the words "shall be ratified and confirmed." The United States supreme court, in construing those words, in *Foster* v. *Neilson*, (2 *Peters*, 253,) held that they imported a contract to be performed at some future time, and therefore, as has been already mentioned, required legislation before that part of the treaty could become a rule for the courts. That treaty again came before the court in the *United States* v. *Percheman*,

In the matter of Metzger.

7 *Peters*, 87,) and there it was said that the treaty was drawn up in the Spanish as well as the English language. Both were originals and were unquestionably intended by the parties to be identical. The Spanish had been translated, and they then understood that the article (of the treaty,) as expressed in that language, was that the grants "shall remain ratified and confirmed," &c. The court then holds that if the English and Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail. No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words "shall be ratified and confirmed" are properly words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they shall be ratified and confirmed by force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, we think the construction proper if not unavoidable. To apply that principle to the case in hand. The convention with France, under consideration, is drawn up in the French as well as the English language. In the latter language, when the party to be surrendered is spoken of, he is twice spoken of as the person "charged" and twice as the person "accused." In the French counterpart, the expression is uniformly accusé; "les individus accusés,"—"les individus qui accusés"—"les individus qui seront accusés "— "L'individu ainsi accusé." It appears from the opinion of the learned district judge, that it was claimed before him that this French phrase was equivalent to the term in our law indicted or arraigned, and that it was proved before him that such is the understanding of the term by the bar and the courts in France: *inculpe* and *prevenue* designate persons against whom criminal charges or proceedings are instituted, up to the period when the charges are acted upon by the *chambre de conseil,* and an accusation is decreed by it, and then, and not before, they become *accuses.* (*Code d'inst. Crim. Arts*, 127, 128, 241, 265.) The same question, then, arises here that arose under the Spanish

In the matter of Metzger.

treaty.   Which language is to prevail in the construction?   If the English, then a party merely " charged " or " accused " before the committing magistrate may be demanded.   The prisoner is in that precise situation.   He has been charged or accused before a magistrate authorized to arrest, and nothing more.   But if the French phrase is to prevail, then the prisoner does not come within the treaty, because he has never been indicted or arraigned, never been *mis en accusation.*(c)

There is a great difference in the French practice, as well as in ours, between a person merely charged with a crime and one who has been indicted ; between *inculpe* and *accusee.* There is much more solemnity in the latter than in the former—more probability of guilt.   A farther progress toward conviction has been attained, and the questions both as to the guilt of the prisoner, and the nature of the offence, no longer rest merely upon the untried and uninvestigated complaint of a party, but have been investigated by the proper tribunal, the grand jury, or the *chambre de conseil,* and probable cause for the accusation being duly found, and the nature of the offence charged duly defined.   This is an important consideration ; for it is not every offence with which a person may be charged, for which he can be surrendered.   It is only a few specified cases : and it often becomes an extremely difficult question for courts, even after the fact is established, to ascertain the nature of the offence growing out of it.

(c) It was held, that in the case of *The British Prisoners,* referred to in notes (a) and (b), that an application under the treaty with Great Britain need not be founded on a previous indictment found against the persons whose surrender is sought by the British tribunals, nor on any warrant issuing therefrom.   But such applications are founded on the tenth article of the British treaty ; which varies from the corresponding article in the French treaty.   It expressly provides for an examination of the evidence of criminality, by some magistrate in the place or country where the supposed offender is arrested.   The fugitive may merely be *charged* with one of the crimes specified in the treaty as having been committed within the jurisdiction of Great Britain, and may *seek an asylum* or *be found* within our territories ; and then a magistrate here is empowered to issue his warrant, and arrest the fugitive, and himself examine into the imputed offence, before committing him, and unless satisfied of his guilt, will not detain him.   And the court says this evidently was intended to reach cases where no such examination had been made elsewhere.

In the matter of Metzger.

In this case, it is very difficult, if not quite impracticable, for an American lawyer to determine whether the act charged upon the prisoner was forgery under the French law. If the matter had passed through the *chambre de conseil*, and the prisoner had been *mis en accusation*, had become *accusee*, it would have been judicially determined that if the prisoner had done the acts imputed to him, it would constitute the crime of forgery; but now the complexion of the act, whether forgery or not, rests in a great measure, if not solely, on the charge of the complainant. So, too, under our law, it is often difficult to define the boundary between breach of trust and constructive larceny; between mere fraud and the felony of obtaining money under false pretences. And when we come to the exercise of so important a duty as the surrender of a native or naturalized citizen upon the demand of a foreign nation, to be tried in a foreign judicatory, shall it depend on the complexion which the anger or malice of the complainant may give to the case, or shall it obtain its hue from the investigation which the grand jury, or the *chambre de conseil*, may subject it to? These inquiries are too important to have escaped the attention of the contracting parties; and hence we find a phrase, having a definite meaning in the French code, entirely inconsistent with the idea of allowing so important a consideration as extradition to rest upon the color which the complainant may give the matter, purposely, repeatedly and carefully used, in a manner which, under our law, gives it controlling influence over both parties to the treaty. So that a person demanded of the French government by ours, would not be surrendered, unless he had been indicted, or *mis en accusation*. At all events, the French government might so act with great propriety, and point to the language it had carefully used in the convention, as a perfect answer to the demand. Entire reciprocity was evidently aimed at by both parties, and I cannot conceive a reason why the language of the supreme court, in regard to the Spanish treaty, does not apply here with equal force, and why I am not bound to hold, as the supreme court then held, that if the English and French parts can without

violence be made to agree, that construction which establishes this conformity ought to prevail, and that no violence will be done to the language of the treaty by a construction which conforms the English and French to each other. If this construction is to prevail, then it is inevitable that the prisoner is not within the treaty, and cannot be demanded by the French government, nor surrendered by the American; but is entitled to the protection of the laws of this state against the attempt to surrender him.

The conclusion then at which I have arrived is, that the prisoner is not a party accused—*mis en accusation*—within the meaning of the treaty; and that the president cannot execute the power of extradition without both legislative and judicial sanction previously obtained. And I acknowledge that the conclusion commends itself to my favor, because of the protection it is calculated to afford to personal liberty against executive authority.

The prisoner must therefore be discharged.

---

Same Term.     *Before the same Justice.*