FACTOR v. LAUBENHEIMER, U.S. MARSHAL, ET AL.

No. 2.   Argued April 18, 1933.   Reargued October 9, 1933.—Decided December 4, 1933.

278

*Mr. Newton D. Baker* argued the cause for petitioner at the first hearing and also reargued it. With him on the briefs were *Messrs. Rush C. Butler, S. O. Levinson, G. Gale Gilbert, Jr.,* and *Allan J. Carter.* The following synopsis is from the briefs on reargument.

*Mr. William D. Mitchell* reargued the cause for respondent. *Mr. Franklin R. Overmyer* was on the briefs. *Mr. Overmyer* conducted the first argument. The following synopsis is from the brief on reargument.

MR. JUSTICE STONE delivered the opinion of the Court.

On complaint of the British Consul, a United States Commissioner for the Northern District of Illinois issued his warrant to hold petitioner in custody for extradition to England, under Article X of the Webster-Ashburton Treaty of 1842 (1 Malloy's Treaties, pp. 650, 655) as supplemented by the Blaine-Pauncefote Convention of 1889 (1 Malloy's Treaties, 740) and certified the evidence in the proceeding before him to the Secretary of State under the provisions of § 651, Tit. 18, U.S.C.A. The application for extradition was based on a charge that petitioner, at London, had " received from Broadstreet Press Limited " certain sums of money, " knowing the same to have been fraudulently obtained." Upon application by the petitioner for writ of *habeas corpus,* and certiorari in its aid, the District Court for Northern Illinois, ordered him released from custody on the ground that the act charged was not embraced within the applicable treaties because not an offense under the laws of Illinois, the state in which he was apprehended and held. On appeal the Court of Appeals for the Seventh Circuit reversed the judgment of the District Court, 61 F. (2d) 626, on the ground that the offense was a crime in Illinois, as had been declared in *Kelly* v. *Griffin,* 241 U.S. 6. This Court granted certiorari, 289 U.S. 713, on a petition which presented as ground for the reversal of the judgment below that, under the Treaty of 1842 and Convention of 1889, extradition may not be had unless the offense charged is a crime under the law of the state where the fugitive is found and that " receiving money, knowing the same to have been fraudulently obtained," the crime with which the petitioner was charged, is not an offense under the laws of Illinois.

In support of this contention, petitioner asserts that it is a general principle of international law that an offense for which extradition may be had must be a crime both in the demanding country and in the place where

the fugitive is found, and that the applicable treaty provisions, interpreted in the light of that principle, exclude any right of either country to demand the extradition of a fugitive unless the offense with which he is charged is a crime in the particular place of asylum. See *Wright* v. *Henkel,* 190 U.S. 40, 61. But the principles of international law recognize no right to extradition apart from treaty. While a government may, if agreeable to its own constitution and laws, voluntarily exercise the power to surrender a fugitive from justice to the country from which he has fled, and it has been said that it is under a moral duty to do so, (see 1 Moore, Extradition, § 14; Clarke, Extradition, 4th ed., p. 14) the legal right to demand his extradition and the correlative duty to surrender him to the demanding country exist only when created by treaty. See *United States* v. *Rauscher,* 119 U.S. 407, 411, 412; *Holmes* v. *Jennison,* 14 Pet. 540, 569, 582; *United States* v. *Davis,* 2 Sumner 482; Case of *Jose Ferreira dos Santos,* 2 Brock. 493; *Commonwealth ex rel. Short* v. *Deacon,* 10 S. & R. 125; 1 Moore, Extradition, §§ 9–13; cf. *Matter of Washburn,* 4 Johns. Ch. 105, 107; 1 Kent. Com. 37. To determine the nature and extent of the right we must look to the treaty which created it. The question presented here, therefore, is one of the construction of the provisions of the applicable treaties in accordance with the principles governing the interpretation of international agreements.

The extradition provisions of the treaty with Great Britain of 1842[1] are embodied in Article X, which pro-

---

[1] The applicable provisions of the Treaty of 1842 are as follows:

" . . . and whereas it is found expedient, for the better administration of justice and the prevention of crime within the territories and jurisdiction of the two parties, respectively, that persons committing the crimes hereinafter enumerated, and being fugitives from justice, should, under certain circumstances, be reciprocally delivered up: . . .

"ARTICLE X. It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their Ministers,

vides that each country "shall . . . deliver up to Justice all persons who, being charged with " any of seven named crimes " committed within the jurisdiction of either, shall seek an asylum or shall be found within the territories of the other." The crime charged here is not one of those specified in Article X and is therefore not an offense with respect to which extradition may be demanded, unless made so by the provisions of the supplemental convention of 1889. That convention recites that it is desired by the high contracting parties that the provisions of Article X of the earlier treaty should." embrace certain crimes not therein specified," and agrees by Article I [2] that the provisions of Article X of the earlier treaty

---

officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum or shall be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offence had there been committed; and the respective judges and other magistrates of the two Governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper Executive authority, that a warrant may issue for the surrender of such fugitive. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition and receives the fugitive."

[2] The applicable provisions of the Convention of 1889 are as follows:

" Whereas by the Tenth Article of the Treaty concluded between the United States of America and Her Britannic Majesty on the ninth day of August, 1842, provision is made for the extradition of persons charged with certain crimes;

"And Whereas it is now desired by the High Contracting Parties that the provisions of the said Article should embrace certain crimes

shall be made applicable to an added schedule of crimes specified in ten numbered classes of offenses and one unnumbered class. In the case of certain offenses, those enumerated in the classes numbered 4 and 10, and in the unnumbered class, Article X applies only if they are, in the former case, "made criminal" and, in the latter,

not therein specified, and should extend to fugitives convicted of the crimes specified in the said Article and in this Convention;

"The said High Contracting Parties have appointed as their Plenipotentiaries to conclude a Convention for this purpose, . . .

"Who, after having communicated to each other their respective full powers, found in good and due form, have agreed upon and concluded the following Articles:

### ARTICLE I.

"The provisions of the said Tenth Article are hereby made applicable to the following additional crimes:

"1. Manslaughter, when voluntary.

"2. Counterfeiting or altering money; uttering or bringing into circulation counterfeit or altered money.

"3. Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained.

"4. Fraud by bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries.

"5. Perjury, or subornation of perjury.

"6. Rape; abduction; child-stealing; kidnapping.

"7. Burglary; house-breaking or shop-breaking.

"8. Piracy by the law of nations.

"9. Revolt, or conspiracy to revolt by two or more persons on board a ship on the high seas, against the authority of the master; wrongfully sinking or destroying a vessel at sea, or attempting to do so; assaults on board a ship on the high seas, with intent to do grievous bodily harm.

"10. Crimes and offenses against the laws of both countries for the suppression of slavery and slave-trading.

"Extradition is also to take place for participation in any of the crimes mentioned in this Convention or in the aforesaid Tenth Article, provided such participation be punishable by the laws of both countries."

"punishable," "by the laws of both countries." No such limitation is expressed with respect to the crimes enumerated in the other eight classes, one of which, the third, includes the crime with which petitioner is charged. Thus, like Article X of the earlier treaty, Article I specifies by name those offenses upon accusation of which the fugitive is to be surrendered and it extends to them the obligation of the earlier treaty. But Article I, unlike Article X, singles out for exceptional treatment certain of the offenses named, which in terms are brought within the obligation of the treaty only if they are made criminal by the laws of both countries.

Notwithstanding this distinction, appearing on the face of the Convention, petitioner insists that in no case does it require extradition of a fugitive who has sought asylum in the United States unless the criminal act with which he is charged abroad is similarly defined as a crime by the laws of the particular state, district or territory of the United States in which he is found. The only language in the two treaties said to support this contention is the proviso in Article X of the treaty of 1842, following the engagement to surrender fugitives charged with specified offenses, which reads as follows:

"Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offence had there been committed; . . ."

It cannot be said that these words give any clear indication that a fugitive charged with acts constituting a crime named in the treaty is not to be subject to extradition unless those acts are also defined as criminal by the laws of the state in which he is apprehended. The proviso would appear more naturally to refer to the procedure to be followed in the country of the asylum in asserting and making effective the obligation of the treaty

and particularly to the quantum of proof—the "evidence"—which is to be required at the place of asylum to establish the fact that the fugitive has committed the treaty offense within the jurisdiction of the demanding country.

When the treaty was adopted there was no statutory provision of the United States regulating the procedure to be followed in securing extradition of the fugitive, and the necessary procedure was provided in the treaty itself. By the proviso, the observance of the laws of the place of refuge is exacted in apprehending and detaining the fugitive. See *Benson* v. *McMahon*, 127 U.S. 457; *In re Metzger*, 17 Fed. Cas. 232. It prescribes a method of procedure, in conformity with local law, by which compliance with the obligation of the treaty may be exacted at the place of refuge; and sets up a standard by which to measure the amount of the proof of the offense charged which the treaty requires as prerequisite to extradition. The standard thus adopted is that which under local law would determine the sufficiency of the evidence to justify the apprehension and commitment " if the crime or offense had there been committed." [3]

---

[3] The Act of Congress, August 12, 1848, c. 167, § 1, 9 Stat. 302, prescribed the procedure before a commissioner or federal judicial officer to secure the apprehension and detention of fugitives whose extradition is demanded under any treaty or convention with any foreign government. This enactment was the source of § 5270, R.S., now § 651, Tit. 18, U.S.C.A., which provides: " If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him to the Secretary of State, that a warrant may issue upon the requisition . . ." It does not require that the act charged as a treaty offense be found to be one made criminal by the laws of the place of asylum. By Act of August 3, 1882, c. 378, § 5, 22 Stat. 216, § 655, Tit. 18, U.S.C.A., provision was made for receiving in evidence in such proceedings, depositions, warrants and other papers, such as may be received for similar purposes by the tribunals of the foreign country from which

Were Article X intended to have the added meaning insisted upon by petitioner, that there should be no extradition unless the act charged is one made criminal by the laws of the place of refuge, that meaning would naturally have been expressed in connection with the enumeration of the treaty offenses, rather than in the proviso which, in its whole scope, deals with procedure. That no such meaning can fairly be attributed to the proviso becomes evident when Article X is read, as for present purposes it must be, with the supplementary provisions of the Convention of 1889.

The draftsmen of the latter document obviously treated the proviso as dealing with procedure alone, since they took care to provide in Article I that fugitives should be subject to extradition for certain offenses, only if they were defined as criminal by the laws of both countries, but omitted any such provision with respect to all the others enumerated, including the crime of "receiving," with which petitioner is charged.[4] This was an unnecessary

---

the fugitive shall have escaped. This legislation has not been thought to dispense with the necessity o the *proviso* contained in the Treaty of 1842, which has generally been included in later treaties, see footnote 4, *infra*, but it has been deemed to have relaxed the procedure exacted by the proviso in favor, of the demanding country. *Elias* v. *Ramirez*, 215 U.S. 398, 409; *Bingham* v. *Bradley*, 241 U.S. 511, 517; *In re Dubroca y Paniagua*, 33 F. (2d) 181; compare *Collins* v. *Loisel*, 259 U.S. 309, 315, 316.

[4] The Supplementary Extradition Treaty with Great Britain of December 13, 1900, Malloy's Treaties, 780, added three classes to the list of crimes for which extradition could be demanded under the earlier treaties, but omitted any requirement that they be criminal by the laws of both countries. By the Supplementary Extradition Treaty with Great Britain of April 12, 1905, Malloy's Treaties, 798, two other crimes were added to the schedule of extraditable offenses, as follows:

"14. Bribery, defined to be the offering, giving or receiving of bribes made criminal by the laws of both countries.

"15. Offenses, if made criminal by the laws of both countries, against bankruptcy law."

precaution and one not consistently taken if the proviso already precluded extradition when the offense charged is not also criminal in the particular place of asylum. A less strained and entirely consistent construction is that urged by respondent, that the specification of the crime of " receiving," as a treaty offense, without qualification, evidenced an intention to dispense with the restriction applied to other treaty offenses, that they must be crimes " by the laws of both countries."

In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if a treaty fairly admits of two constructions,

By the Dawes-Simon Treaty of 1932, 47 Stat. 2122, not yet promulgated by Great Britain, the proviso, modified and stated in a separate article, reads as follows:

" The extradition shall take place only if the evidence be found sufficient, according to the laws of the High Contracting Party applied to, either to justify the committal of the prisoner for trial, in case the crime or offence had been committed in the territory of such High Contracting Party, or to prove that the prisoner is the identical person convicted by the courts of the High Contracting Party who makes the requisition, and that the crime or offence of which he has been convicted is one in respect of which extradition could, at the time of such conviction, have been granted by the High Contracting Party applied to."

This treaty enumerates twenty-seven classes of extraditable offenses and one unnumbered class, but extradition is conditional upon the offense charged being criminal in the country of asylum in the case of two classes only, as follows:

" 6. Indecent assault if such crime or offence be indictable in the place where the accused or convicted person is apprehended.

one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred. *Jordan* v. *Tashiro*, 278 U.S. 123, 127; *Geofroy* v. *Riggs*, 133 U.S. 258, 271; *In re Ross*, 140 U.S. 453, 475; *Tucker* v. *Alexandroff*, 183 U.S. 424, 437; *Asakura* v. *Seattle*, 265 U.S. 332. Unless these principles, consistently recognized and applied by this Court, are now to be discarded, their application here leads inescapably to the conclusion that the treaties, presently involved, on their face require the extradition of the petitioner, even though the act with which he is charged would not be a crime if committed in Illinois.

In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating

---

" Extradition is also to be granted for participation in any of the aforesaid crimes or offences, provided that such participation be punishable by the laws of both High Contracting Parties."

The extradition treaty with Germany of July 12, 1930, contains a stipulation that fugitives shall be delivered up with respect to all the offenses enumerated in the treaty " only if they are punishable as crimes or offenses by the law of both countries applicable to the case." In each of the following treaties the proviso of Article X of the Treaty with Great Britain of 1842 appears, as does also the distinction made in Article I of the Convention of 1889 between offenses with respect to which it is specifically provided that they shall be extraditable only if they are defined as criminal by the laws of both countries, and other offenses with respect to which no such requirement is made: Austria, January 31, 1930; Bolivia, April 21, 1900; Brazil, May 14, 1897; Bulgaria, March 19, 1924; Chile, April 17, 1900; Costa Rica, November 10, 1922; Cuba, April 6, 1904, January 14, 1926; Czechoslovakia, July 2, 1925; Denmark, January 6, 1902; Esthonia, November 8, 1923; Finland, August 1, 1924; Greece, May 6, 1931; Latvia, October 16, 1923; Lithuania, April 9, 1924; Netherlands, May 22, 1880, June 2, 1887; Norway, June 7, 1893, December 10, 1904; Panama, May 25, 1904; Poland, November 22, 1927; Portugal, May 7, 1908; Roumania, July 23, 1924; Servia, October 25, 1901; Siam, December 30, 1922; Spain, August 7, 1882, June 15, 1904; Sweden and Norway, March 21, 1860.

to the subject matter, and to their own practical construction of it. *Nielsen* v. *Johnson,* 279 U.S. 47, 52; *In re Ross, supra,* 467; *United States* v. *Texas,* 162 U.S. 1, 23; *Kinkead* v. *United States,* 150 U.S. 483, 486; *Terrace* v. *Thompson,* 263 U.S. 197, 223. And in resolving doubts the construction of a treaty by the political department of the government, while not conclusive upon courts called upon to construe it, is nevertheless of weight. *Nielsen* v. *Johnson, supra,* 52; *Charlton* v. *Kelly,* 229 U.S. 447, 468. But the exhaustive search, by counsel, through available diplomatic records and correspondence, in response to the invitation of the Court in its order for reargument of this cause, has disclosed nothing in diplomatic history which would afford a basis for any different conclusion.

Within two years of the proclamation of the Treaty of 1842, our State Department had occasion to construe the provisions of Article X, now under consideration, and to take a definite position as to their scope and meaning. Certain fugitive slaves, charged with robbery and murder by indictment of the grand jury for the District of Florida, had fled to Napan in the Bahama Islands. Requisition was made in due course for their extradition, and the Governor of the Bahamas, in conformity to the local procedure, issued his requisition for the fugitives to the Chief Justice of the Colony. The court over which he presided refused to order the extradition of the fugitives and directed their discharge on the grounds that the indictment was not of itself sufficient evidence of the commission of the offense and that the offense charged, apparently committed by the slaves in effecting their escape, although criminal in Florida, did not appear to be so under British law.

From the ensuing diplomatic correspondence it clearly appears that this government then asserted that the Treaty of 1842 obligated both parties to surrender fugitives duly charged with any of the offenses specified in

Article X without regard to the criminal quality of the fugitive's acts under the law of the place of asylum. This contention was supported by full and cogent argument in the course of which it was specifically pointed out that the proviso of Article X relates to the procedure to be followed in asserting rights under the treaty and is not a limitation upon the definition of the offenses with respect to which extradition might be demanded.[5]

---

[5] In a letter of instructions by Mr. Calhoun, then Secretary of State, to Edward Everett, Minister to Great Britain, of August 7, 1844, the latter was directed to bring the subject to the attention of the British Government, to press upon it this construction of Article X and to ascertain what construction that government intended to adopt. Department of State: 15 Instructions, Great Britain, 205, No. 99. After quoting the provisions of the Article the Secretary of State said:

"It comprehends all *persons charged* with the crimes of murder, robbery, etc., etc., *committed within the jurisdiction* of the party making the requisition, and *found in the territory* of that on whom the requisition is made. That these words are broad enough to comprehend the case under consideration, is beyond doubt; and, of course, the only possible question which can be made is, whether it is not taken out by the proviso which immediately follows. . . ."

and after quoting the proviso he continued:

" It is too plain to require proof that it relates to the evidence on which the fugitive is to be given up to justice, exclusively, without intending to restrict or change the body of the agreement. That having clearly specified who were to be delivered up to justice on the requisition of either party, it became necessary, in order to give effect to the agreement, to specify on what evidence it should be done; and to do that, accordingly, is the sole object of the proviso. It specifies that it shall be done on such evidence of criminality as would justify his apprehension and commitment for trial by the laws of the place where the fugitive is found, had the crime *charged* been there committed; that is, if the crime *charged* be murder or robbery, as in this case, on such evidence as would justify apprehension and commitment for trial for murder or robbery at the place.

" Taking the body of the agreement and proviso together, it would seem to be unquestionable that the true intent of the article is, that the *criminality* of the act charged should be judged of by the laws of the country within whose jurisdiction the act was perpetrated; but that *the evidence* on which the fugitive should be delivered up to

The political department of the government, before the
negotiation of the Convention of 1889, had thus clearly

---

justice should be by the laws of the place where he shall be found.
Both are to be judged by the laws of the place where they occur; and
properly so, as they are paramount within their respective limits.
And hence it is expressly specified in the body of the agreement, that
the crime charged must have been committed within the jurisdiction
of the party making the requisition; and in the proviso that the evi-
dence, on which the fugitive shall be delivered up, shall be such as is
required to apprehend and commit for trial according to the laws of
the place where he is found."

Mr. Everett's report to the Secretary of November 23, 1844 (De-
partment of State: 53 Despatches, Great Britain, No. 216), of his
conversations with Lord Aberdeen, British Secretary of Foreign Af-
fairs, on this subject, being deemed unsatisfactory by the Secretary,
he directed that the conversations be renewed in a letter of instruc-
tions of January 28, 1845 (Department of State: 15 Instructions,
Great Britain, No. 120). After pointing out that the question was
equally important with respect to all the crimes enumerated in Article
X, he said:

" It is obvious, from the preceding remarks, that the question
whether the criminality of the act is to be judged of by the laws of the
country where the offence was committed or that where the fugitive
may be found, is one of wide extent and of first magnitude in the
construction of the treaty. We contend that it must be by the laws
of the place where the crime was charged to have been committed, and
not that where the fugitive is found; and hold that such construction
is in strict conformity with the wording and true intent of the
treaty, . . .

" You are accordingly instructed to call again the attention of Her
Majesty's government to the subject, and to urge a speedy decision in
strong and earnest language."

The matter appears to have been fully presented to the British
Government by Mr. Everett. Department of State: Mr. Everett to
the Secretary of State, January 31, 1845, 54 Despatches, Great Britain,
No. 250; No. 271, March 3, 1845. But as the British Government
took the position that the indictment of itself was not sufficient evi-
dence of the commission of the offense in Florida, further inquiry as to
the government's construction of Article X seems not to have been
pressed or answered. See also the case of John Anderson, a fugitive
slave whose extradition was sought from Canada, discussed in 1 Moore,
Extradition, § 440.

and emphatically taken the position that the correct construction of Article X is that for which respondent contends here, a construction which, as already indicated, is supported and confirmed by the provisions of the Convention of 1889. Our government does not appear to have receded from that position, and while the British Government has never definitely yielded to it, except insofar as the arguments addressed to us in behalf of the respondent may be taken to have that effect, that fact, or even the failure of Great Britain to comply with the obligations of the treaty, would not be ground for refusal by this government to honor them or by this Court to apply them. Until a treaty has been denounced, it is the duty of both the government and the courts to sanction the performance of the obligations reciprocal to the rights which the treaty declares and the government asserts, even though the other party to it holds to a different view of its meaning. *Charlton* v. *Kelly, supra,* 472, 473. The diplomatic history of the treaty provisions thus lends support to the construction which we think should be placed upon them when read without extraneous aid, but with that liberality demanded generally in the interpretation of international obligations.

Other considerations peculiarly applicable to treaties for extradition, and to these treaties in particular, fortify this conclusion. The surrender of a fugitive, duly charged in the country from which he has fled with a non-political offense and one generally recognized as criminal at the place of asylum, involves no impairment of any legitimate public or private interest. The obligation to do what some nations have done voluntarily, in the interest of justice and friendly international relationships, see 1 Moore, Extradition, § 40, should be construed more liberally than a criminal statute or the technical requirements of criminal procedure. *Grin* v. *Shine,* 187 U.S. 181, 184; *Yordi* v.

*Nolte,* 215 U.S. 227, 230. All of the offenses named in the two treaties are not only denominated crimes by the treaties themselves, but they are recognized as such by the jurisprudence of both countries.[6] Even that with which petitioner is charged is a crime under the law of many states, if not in Illinois, punishable either as the crime of receiving money obtained fraudulently or by false pretenses, or as larceny.[7] See *United States* v. *Mulligan,* 50 F. (2d) 687. Compare *Kelly* v. *Griffin, supra,* p. 15. It has been the policy of our own government, as of others, in entering into extradition treaties, to name as treaty offenses only those generally recognized as criminal by the

---

[6] President Tyler, in his message transmitting the Treaty of 1842 to the Senate for consideration, referred to Article X as " carefully confined to such offenses as all mankind agreed to regard as heinous and as destructive to the security of life and property. In this careful and specific enumeration of crimes, the object has been to exclude all political offenses, or criminal charges, arising from wars or intestine commotions." Executive Documents, Vol. 1, 1842–3, Doc. No. 2, p. 22.

[7] Alabama, Code of 1923, §§ 4131, 4912; Arkansas, Crawford & Moses Digest of Statutes of 1921, §§ 2449 and 2493; California, Penal Code of 1931, §§ 484, 496; Idaho, Code of 1932, §§ 17-3902 and 17-3512; Indiana, Burns' Annotated Statutes of 1926, § 2465; Kansas, Revised Statutes of 1923, §§ 21-551 and 21-549; Louisiana, Code of Criminal Procedure and Criminal Statutes of 1932, art. 1306; Massachusetts, General Laws of 1932, c. 266, § 60; Minnesota, Mason's Statutes of 1927, §§ 10358, 10374; Missouri, Revised Statutes of 1929, §§ 4095 and 4083; Montana, Rev. Codes of 1921, §§ 11410 and 11388; Nevada, Compiled Laws of 1929, § 10543, as amended by L. 1931, c. 117, § 1; New Jersey, § 52-166 e (1) of 1925–1930 Supplement to Compiled Statutes of 1911; New York, Penal Law, §§ 1290 and 1308; North Carolina, Code of 1931, §§ 4277 and 4250; Ohio, Throckmorton's Annotated Code of 1930, § 12450; Rhode Island, General Laws of 1923, §§ 6072 and 6070, as amended by L. 1928, c. 1208; Tennessee, Code of 1932, §§ 10949, 10950; Utah, Compiled Laws of 1917, §§ 8344 and 8297; Virginia, Code of 1930, §§ 4459 and 4448; West Virginia, Code of 1931, p. 1469, c. 61, art. 3, § 24; page 1467, c. 61, art. 3, § 18; Wyoming, Revised Statutes of 1931, § 32–318.

laws in force within its own territory.[8]  But that policy, when carried into effect by treaty designation of offenses with respect to which extradition is to be granted, affords no adequate basis for declining to construe the treaty in accordance with its language, or for saying that its obligation, in the absence of some express requirement, is conditioned on the criminality of the offense charged according to the laws of the particular place of asylum.  Once the contracting parties are satisfied that an identified offense is generally recognized as criminal in both countries, there is no occasion for stipulating that extradition shall fail merely because the fugitive may succeed in finding, in the country of refuge, some state, territory or district in which the offense charged is not punishable.  No reason is suggested or apparent why the solemn and unconditional engagement to surrender a fugitive charged with the named offense of which petitioner is accused should admit of any inquiry as to the criminal quality of the act charged at the place of asylum beyond that necessary to make certain that the offense charged is one named in the treaty.  See *Collins* v. *Loisel,* 259 U.S. 309, 317; *Grin* v. *Shine, supra,* 188.

It is of some significance also that the construction which petitioner urges would restrict the reciprocal operation of the treaty.  Under that construction the right to extradition from the United States may vary with the state or territory where the fugitive is found although extradition may be had from Great Britain with respect to all the offenses named in the treaty.  While under the laws of Great Britain extradition treaties are not self-executing, and effect must be given to them by an act of Parliament designating the crimes, upon charge of which

[8] See Dispatch No. 3, August 4, 1885, Secretary Bayard to Phelps, Minister to England; Letter from Ambassador Choate to the Marquess of Lansdowne, of April 5, 1905.

extradition from Great Britain and its dependencies may be had, all the offenses named in the two treaties have been so designated by Acts of Parliament of 1870, 33 and 34 Victoria, c. 52, as amended by Act of 1873, 36 and 37 Victoria, c. 60.

The District Court for Southern New York, decided, in 1847, that the proviso in the Extradition Treaty with France of November 9, 1843, like that in Article X, did not require that the treaty offense charged to have been committed in France should also be a crime in New York, the place of asylum. *In re Metzger, supra.* The precise question now before us seems not to have been decided in any other case, and in no case in this Court has extradition been denied because the offense charged was not also criminal by the laws of the place of refuge. In *Wright* v. *Henkel, supra,* the offense charged, fraud by a director of a company, was, by paragraph 4 of Article I of the Convention of 1889, a treaty offense only if made criminal by the laws of both countries. In *Collins* v. *Loisel, supra,* and in *Kelly* v. *Griffin, supra,* the question was whether the crime charged was a treaty offense. The court so held and the right to extradition was sustained. The offense charged was said to be a crime in both countries, and it seems to have been assumed without discussion, and not questioned, that its criminality at the place of asylum was necessary to extradition. See also *Bingham* v. *Bradley,* 241 U.S. 511, 518. That assumption is shown here to have been unfounded.

The petitioner also objects that the Dawes-Simon extradition treaty with Great Britain of 1932, 47 Stat. 2122, is now in force; that it does not name as a treaty offense the receiving of money, knowing it to have been fraudulently obtained, the crime with which petitioner is charged, and, that by abrogating the earlier extradition treaties between the two countries it has abated this

proceeding and that for the extradition of the petitioner, which was brought while the Treaty of 1842 and the Convention of 1889 were in force.

The ratifications of the Dawes-Simon Treaty were announced by presidential proclamation of August 9, 1932, which declared that the treaty was made public to the end that " every article and clause thereof may be observed and fulfilled with good faith " by the United States and its citizens. Article 18 provides that: " The present treaty shall come into force in ten days after its publication in conformity with the forms prescribed by the high contracting parties." Under the applicable provisions of the British Extradition Act of 1870, 33 and 34 Victoria, c. 52, as amended by the Act of 1873, 36 and 37 Victoria, c. 60, extradition treaties are carried into effect and given the force of law in Great Britain by publication of an Order-in-Council embodying the terms of the treaty, and directing that the Extradition Act shall apply with respect to the foreign state which has entered into the treaty. As appears from the record, and as is conceded, no Order-in-Council has been promulgated with respect to this treaty, and the State Department appears not to have recognized it as in force in either country. See *Doe* v. *Braden,* 16 How. 635, 656.

We find it unnecessary to determine whether or not the treaty, as suggested on the argument, is now in force, and binding on the United States, although not binding on Great Britain until proclaimed by an Order-in-Council. For if we were to arrive at that conclusion, we could not say that its obligation would not extend to the offense with which petitioner is charged, or that its substitution for the earlier treaties would abate the proceeding for the extradition of petitioner or the pending *habeas corpus* proceeding.

Paragraph 18 of Article 3 of the Dawes-Simon Treaty includes among the offenses for which extradition may be

demanded " receiving any money, valuable security or other property, knowing the same to have been stolen or unlawfully obtained." It is insisted that " receiving money," knowing the same to have been stolen or unlawfully obtained, is not the equivalent of receiving money, knowing the same to have been fraudulently obtained. It is not denied that the phrase " unlawfully obtained," standing alone, is as broad as the phrase " fraudulently obtained." But it is asserted that its use in association with the word " stolen " restricts its meaning to offenses of the same type of unlawfulness as stealing, which it is said involves only those forms of criminal taking which are without the consent or against the will of the owner or the possessor. But we think the words of the treaty present no opportunity for so narrow and strict an application of the rule of *ejusdem generis*. The rule is at most one of construction, to be resorted to as an aid only when words or phrases are of doubtful meaning. Extradition treaties are to be liberally, not strictly, construed. The words " steal " and " stolen " have no certain technical significance making them applicable only with respect to common law larceny. They are not uncommonly used as implying also a taking or receiving of property by embezzlement or false pretenses, offenses which are often embraced in modern forms of statutory larceny.[9] Whatever was left vague or uncertain by the use of the word " stolen " was made certain by the added phrase " or unlawfully obtained," as indicating any form of criminal taking whether or not embraced within the term larceny in its various connotations. Even if the word " stolen " were to be given the restricted meaning for which the petitioner contends, it would be so precise and comprehensive as to exhaust the genus and leave nothing essentially similar on which the general phrase " or unlawfully obtained " could operate. This phrase, like all the other

[9] See Note 7, *ante.*

words of the treaty, is to be given a meaning, if reasonably possible, and rules of construction may not be resorted to to render it meaningless or inoperative. See *Mason* v. *United States,* 260 U.S. 545, 553.

As the crime with which petitioner is charged is an extraditable offense under the Dawes-Simon Treaty, the effective promulgation of that treaty and the consequent abrogation of earlier ones would not abate the pending proceedings. The obligation of the later treaty, by its terms, extends generally to fugitives charged with the several offenses named, without regard to the date of their commission. See *In re Giacomo,* 12 Blatch. 391; 1 Moore on Extradition, § 86. It does not purport to exclude from its operation crimes committed before signature or promulgation, as did Article VIII of the Treaty of 1889. Hence, it did not by mere force of the abrogation of the earlier treaty relinquish the obligation under it to surrender the petitioner, but continued it by making the offense with which he was charged extraditable even though it antedated the treaty.

The extradition proceeding has not come to an end. The petitioner's commitment by order of the commissioner was " to abide the order of the Secretary of State," and continues in force so long as the Secretary may lawfully order his extradition. Hence, the new treaty, if in force, is authority for the Secretary to issue his extradition warrant under § 653 of U.S.C.A., Title 18. The detention of the petitioner being lawful under treaty provisions continuously in force since his arrest, the proceeding in *habeas corpus* is not moot and does not abate merely because the obligation to surrender the petitioner for trial upon the offense charged, and for which he is held, originating in one treaty, was continued without change of substance in the other. See *Abie State Bank* v. *Bryan,* 282 U.S. 765, 781.

*Affirmed.*

Mr. Justice Butler, dissenting.

I. The decision just announced holds that the United States is bound by treaty to surrender its citizens and others to England there to be prosecuted criminally and punished for that which if committed here would transgress no law—federal or state. And it is so held despite the established rule that England is not by the treaty bound to grant any extradition upon the demand of this country unless the crime charged against the fugitive is also a crime under English law. The Extradition Act, 1870, § 26, and First Schedule. *Ex parte Piot,* 15 Cox C.C. 208. *Re Bellencoutre,* 17 Cox C.C. 253. Heretofore, this court has steadfastly held that a fugitive, whether alien or a citizen, will not be extradited unless the facts alleged against him in the demanding country are there made criminal, constitute a crime covered by the treaty and are denounced as crime either by some Act of Congress or by the laws of the State where the fugitive is found. *Wright* v. *Henkel,* 190 U.S. 40, 58. *Kelly* v. *Griffin,* 241 U.S. 6, 14, 15. *Bingham* v. *Bradley,* 241 U.S. 511, 517–518. *Collins* v. *Loisel,* 259 U.S. 309, 311–312, 317. See *Pettit* v. *Walshe,* 194 U.S. 205, 217–218. *Glucksman* v. *Henkel,* 221 U.S. 508, 513. The lower courts have adhered to the same rule. *In re Muller,* 17 Fed. Cas. 975. *Cohn* v. *Jones,* 100 Fed. 639, 645–646. *In re Frank,* 107 Fed. 272, 277. *Powell* v. *United States,* 206 Fed. 400, 403. *Collier.* v. *Vaccaro,* 51 F. (2d) 17, 19. *Bernstein* v. *Gross,* 58 F. (2d) 154, 155. See *Greene* v. *United States,* 154 Fed. 401, 406. Cf. *In re Dubroca y Paniagua,* 33 F. (2d) 181.[1]

---

[1] It is true that Judge Betts, in 1847, in *Re Metzger,* 17 Fed. Cas. 232, construed a provision of the French-American treaty that is not distinguishable from that now before us, not to require local criminality and held that unless otherwise specified, *both parties* to the treaty are bound to grant extradition for any listed offense even if not criminal in the place of asylum. But the supreme court of New York, without passing upon that point, discharged Metzger. 1 Barb.

All the text writers, at least so far as research of counsel and court has disclosed, lay down the same principle. Pomeroy, International Law (ed. by Woolsey) §§ 198, 199. Biron and Chalmers, Extradition, p. 11. 1 Phillimore, International Law (3rd ed.), § 367, p. 521. Moore, Extradition, §§ 94, 96.

II. Petitioner, found in Illinois, is accused in England of having received money knowing it to have been fraudulently obtained by the Broad Street Press, Limited. Item 3 of the Convention of 1889 contains the pertinent words—"receiving any money . . . knowing the same to have been . . . fraudulently obtained." Such receiving has not been made criminal by any Act of Congress or any law of Illinois. On that ground, petitioner sought discharge on habeas corpus. *Kelly* v. *Griffin, supra,* held that acts such as those alleged against petitioner constitute crime in Illinois. England did not contend that local criminality is not essential but relied upon the ruling in that case. District Judge Fitzhenry, deeming himself bound, remanded petitioner.

At the hearing before the commissioner, petitioner called as witnesses a number of eminent Illinois lawyers. Their testimony shows beyond doubt that receiving money or property knowing the same to have been fraudulently obtained has not been denounced as crime by the laws of Illinois. England relied solely upon *Kelly* v. *Griffin* and insisted that the commissioner was bound by that decision. The latter accepted that view. Petitioner sought review and release on habeas corpus. District Judge Carpenter heard the application, found such receiving not a crime in Illinois and ordered petitioner's discharge. On appeal England still insisted that *Kelly* v. *Griffin* required a contrary ruling. The Circuit Court of

248. It does not appear that he was ever retaken or surrendered for prosecution in France. England's brief on reargument fails to cite the case. And see Moore, Extradition, § 344.

Appeals so held. One of the three judges dissented. It was in that court that England first suggested that criminality in Illinois is not essential.[2] The court held against that contention, citing *Collins* v. *Loisel, supra; Kelly* v. *Griffin, supra,* and *Wright* v. *Henkel, supra.*

On the first argument here England adhered to its contention that *Kelly* v. *Griffin* ruled the case and also argued that criminality at the place of asylum is not essential. Unable to hold that the acts charged against petitioner constitute crime in Illinois, this court ordered reargument upon all questions and directed attention to a point not theretofore suggested: " The interpretation placed upon Article X of the treaty of 1842 by the Secretary of State of the United States, John C. Calhoun, shortly after the ratification of the Treaty (August 7, 1844, January 28, 1845, MSS. Inst. Gr. Br.), and also to the available diplomatic correspondence relating to Article X of the Treaty of 1842 and the Treaty of 1889."

On reargument petitioner brought forward all diplomatic correspondence available to him. It related, not only to the Treaties of 1842 and 1889, but also to subsequent treaties prior to the Dawes-Simon Treaty, 1932. The latter, designed to cover the entire field and to supersede the treaties under consideration, was adopted after extended negotiation. It has been ratified by the Senate and published here. But, while it was duly ratified in England on July 29, 1932, the Order in Council necessary there to make it effective has not yet been promulgated. Our Secretary of State holds that the treaty is not in force. It results, therefore, that the diplomatic correspondence leading up to its consummation was not available to petitioner. England fails to produce any part of it. She

---

[2] After the record in this case was made up before the commissioner, the contention was made, but not passed upon, in the United States Court for the Eastern District of Pennsylvania in *United States* v. *Fetters,* 1 F.Supp. 637.

appears to attribute to Secretary Calhoun's contentions cited in our order little, if any, greater weight than when they were put aside by Her Majesty's Government nearly a century ago. It is to be presumed that, if correspondence leading up to the Dawes-Simon Treaty would support the idea that local criminality is not essential, England would produce it here.

On reargument England gave little, if any, support to its claim that the " receiving " alleged against petitioner is crime in Illinois. And this court, impliedly at least, now holds that it is not, and to that extent overrules *Kelly* v. *Griffin*. England's brief on reargument frankly concedes that it has been the policy of both parties to limit extradition to acts made criminal in the place of asylum. It safely may be said that she does not now seek the adoption of a contrary construction. But, taking a new hold, she insists that the requirement of criminality in both countries is here satisfied. In support of that position she says that petitioner cannot be convicted without proof of guilty knowledge; that the record shows he was a party to the fraud by which the money was obtained, and that, as obtaining by false pretenses and participation in that offense are both criminal in Illinois and extraditable, it must be held that extradition of the petitioner would be within the rule. The court does not take that point, and therefore it need not be considered here. It is mentioned for the purpose of disclosing the principal, if not indeed the sole, ground upon which extradition is now claimed.

III. But the court's decision rests upon the ground that the United States impliedly agreed to extradite for acts not made criminal by its laws or the laws of the state of asylum. Admittedly England did not so agree. There is no warrant for the discrimination. The parties dealt as equals. All their extradition treaties disclose the intention that they shall stand on the same footing. The

governing principle always has been reciprocity and equality.

The extradition provisions of the Jay Treaty of 1794, Art. 27, 8 Stat. 116, 129, which continued in force 12 years, were:

" It is further agreed, that His Majesty and the United States, on *mutual requisitions* . . . will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of either, shall seek an asylum within any of the countries of the other, *provided* that this shall only be done on such evidence of criminality, as, according to the laws of the place, where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed. . . ." (Italics supplied.)

The Webster-Ashburton Treaty of 1842 (8 Stat. 572) in its preamble declares:

"And whereas it is found expedient, for the better administration of justice and the prevention of crime within the territories and jurisdiction of the two parties, respectively, that persons committing the crimes hereinafter enumerated, and being fugitives from justice, should, under certain circumstances, be *reciprocally* delivered up." (Italics supplied.)

It repeats the clause, originating in the Jay Treaty, providing for mutual requisitions. It includes five additional crimes, making seven in all. They are (Art. X, p. 576): murder, assault with intent to commit murder, piracy, arson, robbery, forgery, and the utterance of forged paper. It also repeats the *proviso* contained in the Jay Treaty.

The declaration of purpose that fugitives be " reciprocally delivered up " and the provision for " mutual requisitions " mean that neither shall have advantage over the other, or be entitled to demand any extradition which under corresponding circumstances it would not be bound

to grant, and directly negative the notion that the United States alone is bound to extradite for acts not criminal where the fugitive is found.

The Blaine-Pauncefote Convention of 1889 (26 Stat. 1508) added to the list in the Webster-Ashburton Treaty ten numbered offenses. They are:

" 1. Manslaughter, when voluntary.

2. Counterfeiting or altering money; uttering or bringing into circulation counterfeit or altered money.

3. Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained.

4. Fraud by bailee, banker, agent, factor, trustee, or director or member or officer of any company, made criminal by the laws of both countries.

5. Perjury, or subornation of perjury.

6. Rape; abduction; child-stealing; kidnapping.

7. Burglary; house-breaking or shop-breaking.

8. Piracy by the law of nations.

9. Revolt, or conspiracy to revolt by two or more persons on board a ship on the high seas, against the authority of the master; wrongfully sinking or destroying a vessel at sea, or attempting to do so; assaults on board a ship on the high seas, with intent to do grievous bodily harm.

10. Crimes and offences against the laws of both countries for the suppression of slavery and slave-trading."

" Extradition is also to take place for participation in any of the crimes mentioned in this Convention or in the aforesaid Tenth Article, provided such participation be punishable by the laws of both countries."

The supplementary treaty of 1900 (32 Stat. 1864) added:

" 11. Obtaining money, valuable securities or other property by false pretenses.

12. Wilful and unlawful destruction or obstruction of railroads which endangers human life.

13. Procuring abortion."

The supplementary treaty of 1905 (34 Stat. 2903) added:

" 14. Bribery, defined to be the offering, giving or receiving of bribes made criminal by the laws of both countries.

15. Offences, if made criminal by the laws of both countries, against bankruptcy law."

IV. The majority opinion notes the absence of any express requirement of criminality in both countries in item 3, which includes the acts alleged against petitioner; it emphasizes " made criminal by the laws of both countries " qualifying " fraud " in item 4, and from that it infers that, as to acts not similarly qualified, criminality in the asylum state here is not essential. That indeed is the ground upon which the court's opinion rests.

But the indefinite terms by which the qualified offenses are designated fully account for the use of the words of limitation. An examination of the list discloses that, where there is an express requirement of the criminality in both countries, the purpose is to make certain that the acts are criminal, or to safeguard against demands for extradition for acts not criminal in the asylum country. Neither the Jay Treaty nor the Webster-Ashburton Treaty contains any provision expressly limiting extradition to acts made criminal in both countries. No such specification was necessary, as the transgressions listed are grave and well-known to have been denounced as crimes by the laws of both countries. Qualifying clauses are often used in treaties, statutes and agreements where the meaning would be the same if they were omitted. Article II of the Convention of 1889 furnishes an example. It declares that no fugitive shall be surrendered for any offense of a political character. As no crime of that sort is listed, the provision is unnecessary. That clause, like the expression requiring criminality in both countries, is used, not to add or change meaning, but to

emphasize and insure adherence to a well-known general principle always held applicable in the absence of any such specification. And Article III declares that a person surrendered cannot be tried in the demanding country for any crime committed prior to extradition other than that for which he was extradited. These clauses add nothing to the protection to which the fugitive has been held entitled in the absence of such stipulations. *United States* v. *Rauscher,* 119 U.S. 407, 419–422.

The history of item 4 negatives any inference such as that drawn by the majority. It was taken from, and, omitting "public," is precisely the same as, a clause in the British Extradition Act.[3] As "public officer of any company" is unknown to our law, the word "public" was dropped. In the British statute "fraud" is qualified by "made criminal by any act for the time being in force." A corresponding definition of "fraud" in the treaty was needed for clarification, and so the clause "made criminal by the laws of both countries" was added. The doubts that reasonably might arise as to the meaning of the words used more than justified this qualification. Fraud may or may not constitute crime. When the word is used without qualification it does not mean a criminal offense. The item extends to numerous classes of persons, even to members of a corporation. The word "company". is broad enough to include unincorporated associations as well as corporations of all sorts. The laws regulating bankers and others included are well known to lack uniformity and to be subject to frequent changes. Absence of some definitive expression would have left it uncertain whether the "fraud" listed was a civil or criminal wrong.

---

[3] The first schedule of the British Extradition Act contains the following: "Fraud by a bailee, banker, agent, factor, trustee or director, or member, or *public* officer of any company made criminal *by any act for the time being in force.*" The words italicized are omitted from the treaty.

The court does not invoke support from the other items in which qualifying expressions are used. And these items show that the implication drawn by the opinion from the qualifying words in item 4 is groundless and that there is no basis for the application of the canon of construction, *expressio unius,* etc. *Springer* v. *Philippine Islands,* 277 U.S. 189, 206. Let them be examined.

Item 10 covers " crimes or offences against the laws of both countries for the suppression of slavery and slave-trading." If the phrase " against the laws of both countries " were omitted, the provision would have no meaning.

The unnumbered item in the Convention of 1889 covers " participation " in the commission of the crimes listed in that Convention and in the Treaty of 1842. The limitation to such as is made punishable by the laws of both countries was added to bring " participation " within the general principle. The parties did not intend that one accused of such receiving in England would be extraditable from a State where the act violates no law, while the person guilty of participation by aiding, inducing, procuring or commanding him to commit the crime would be entitled there safely to remain.

The " bribery " covered by item 14 is limited to such as is defined by the laws of both countries. The correspondence leading to agreement upon that item shows that both parties intended as always to adhere to the principle of limiting extradition to acts made criminal by the laws of both countries. Ambassador Choate for the United States proposed a clause not expressly requiring criminality in both countries. The Marquess of Lansdowne for His Brittanic Majesty proposed the form adopted. Choate accepted and in a carefully prepared letter made it perfectly plain that, upon the principle declared in *Wright* v. *Henkel, supra,* the rule requiring criminality in both countries would apply even if not stated in the item.

Offences against bankruptcy law, if made criminal by the laws of both countries, are covered by item 15. Lack of uniformity in different parts of the Empire and, when no federal Act is in force, among the several States in this country, made the qualification of criminality in both countries necessary in the interest of certainty and to maintain the general rule that the asylum country denies extradition for acts not there deemed criminal. Moreover, the qualifying clause is necessary to limit the provision to criminal acts, for without it " offences . . . against the bankruptcy law " would not necessarily imply criminality, but might include, for example, such transgressions as merely require denial of discharge.

It is said that, as some States denounce as criminal the receiving of money or property, knowing the same to have been fraudulently obtained, while others do not, extradition is made to depend upon the place where the fugitive happens to be found. That suggestion gives no support to the decision. The negotiators well knew that criminal laws are not the same throughout the territories involved. England acted for all parts of the British Empire, the United States acted for itself and all the States. Undoubtedly, the criminal laws in England, Ireland, Scotland, Australia, Canada and other territories beyond the seas differ as widely as do those in Illinois, New York, Pennsylvania and other States. These treaties were made having regard to such lack of uniformity.

While the proviso in Article X relates to the quantum of evidence required to support the demand for extradition rather than to the obligations assumed or rights granted, it significantly coincides with the principle that extradition will not be granted by the asylum country for acts not there deemed criminally wrong. Indeed, when taken in connection with the declaration of mutuality and reciprocity and the crimes named in the list, the proviso supports that principle. For obviously, as in substance

suggested by England and held by the majority, the proviso means that extradition shall only be granted upon such evidence as according to the laws of the place where the fugitive is found " would justify his apprehension and commitment for trial, if [the acts constituting] the crime or offence had there been committed."

V. The court's decision is in direct conflict with the principle governing the interpretation of extradition treaties as propounded by the United States and as declared by this court in *Wright* v. *Henkel, supra.* The Solicitor General said (190 U.S. 55, 56) : " That the offence must be one made criminal by the laws of both countries is a principle inherent in all extradition treaties. This is obvious because of the reciprocal nature of such engagements and the existence and similarity of crime in all places, whatever the differences as to definition and incidents of any particular crime. . . . Treaties plainly imply the doctrine, but do not ordinarily express it. Such is the force of the phrase ' mutual requisitions.' Art. X, Webster-Ashburton Treaty." And, applying the rule to the case then in hand, the brief added: " No phrase was needed in the treaty of 1889 to explain the crimes of murder, burglary, etc., nor to express the necessity of criminality in both countries. They *are* criminal in both countries without that. The difference as to clause 4 . . . respecting fraud by bailee is that as to that class of offences, not yet completely established as criminal, the two powers decline to engage respecting species still carrying a mere civil liability, and therefore the phrase ' made *criminal* by the laws of both countries ' was used."

And this court, speaking through its Chief Justice, said (pp. 57, 58) : " Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose. . . . The general principle of international law is that in all cases of extradition the act done on account of which extradition

is demanded must be considered a crime by both parties, and as to the offence charged in this case [fraud covered by item 4] the treaty of 1889 embodies that principle in terms. The offence must be 'made criminal by the laws of both countries' . . ." P. 60: "Where there was reason to doubt whether the generic term embraced a particular variety, specific language was used. As for instance, . . . as to fraud and breach of trust, which had been brought within the grasp of criminal law in comparatively recent times."

The principle governing interpretation of extradition treaties, so definitely explained by the Chief Justice in *Wright* v. *Henkel, supra,* has been uniformly followed here.

In *Kelly* v. *Griffin, supra,* perjury was one of the offenses for which Canada sought extradition of the fugitive from Illinois. That offense is covered by item 5, which contains no express requirement of criminality in both countries. In that respect it is identical with item 3, which covers the receiving here involved. In that country, false testimony, whether material or not, constitutes perjury. But materiality is essential in Illinois. This court found that the false testimony alleged to have been given in Canada was in fact material to the matter there in hand, quoted (p. 14) from *Wright* v. *Henkel, supra*: "It is enough if the particular variety was criminal in both jurisdictions," and held for extradition.

In *Bingham* v. *Bradley, supra,* the offense was receiving money knowing the same to have been stolen. That is covered by item 3, the construction of which is here involved. The court assumed as definitely established by prior decisions that criminality in both countries was essential. And, in concluding its decision holding the fugitive extraditable, it said (p. 517): "And since the jurisdiction of the Commissioner is clear, and the evidence abundantly sufficient to furnish reasonable ground

for the belief that appellant has committed within the Dominion of Canada a crime that is an offense under the laws of the Dominion, as well as under those of Illinois . . . and is covered by the terms of the treaty, and that he is a fugitive from justice, a fair observance of the obligations of the treaty requires that he be surrendered."

In *Collins* v. *Loisel, supra,* the offense was obtaining property by false pretenses, covered by item 11, which contains no words requiring criminality in both countries. The court, directly alluding to the established rule, said (p. 311): " It is true that an offense is extraditable only if the acts charged are criminal by the laws of both countries." And further (p. 312): " The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions. This was held with reference to different crimes involving false statements in *Wright* v. *Henkel,* 190 U.S. 40, 58; *Kelly* v. *Griffin,* 241 U.S. 6, 14; *Benson* v. *McMahon,* 127 U.S. 457, 465; and *Greene* v. *United States,* 154 Fed. 401. Compare *Ex parte Piot,* 15 Cox C.C. 208. The offense charged was, therefore, clearly extraditable."

VI. Some of the reasons supporting the requirement of criminality in both countries as sound and expedient are stated in the report of a royal commission created in 1877 by Queen Victoria to inquire into and consider the workings and effect of the laws and treaties relating to extradition.[4] It says (§ VI): " The crimes in respect of which

---

[4] Royal Commission on Extradition. Report of the Commissioners. The Commissioners were: Sir Alexander Cockburn, Lord Chief Justice; Baron Selborne, Privy Councillor; Baron Blackburn, Lord of Appeal; Russell Gurney, Privy Councillor; Sir Richard Baggalay, Court of Appeal; Sir William Brett, Court of Appeal; Sir John Rose; Sir James Fitzjames Stephen, Q.C.; Sir William Harcourt, Q.C.; William Torrens, Esq.

nations should make common cause against criminals, and refuse them shelter, are those which it is the common interest of all to repress. There are offences against society in respect of person and property, which, in all countries, there will always be found persons disposed to commit, and which can only be kept under by the strong arm of the law. It is these offences which it should be the common purpose of all nations to endeavor to suppress by preventing those who have committed them from escaping from justice. But these offences are known to and dealt with by the law of all civilised nations, though they may be differently dealt with both as to procedure and punishment. If some offence, unknown to the law of other nations—to what may figuratively be called the common law of nations—should be created by the law of a particular people, such an offence would not come within the category of crimes which it is the purpose of extradition to repress.

" If it be asked how it is to be ascertained that the offence charged is known and recognized as an offence, the answer is that our own law will afford a sufficient test, being abundantly comprehensive as to offences against person and property.

" Besides which, there is another reason for seeing that the charge in respect of which extradition is asked for is an offence under our own law. It is and always must be necessary that a *prima facie* case shall be made out before a magistrate in order to support the application for extradition. But the English magistrate cannot be expected to know or interpret the foreign law. It is not desirable that he should be required to do more than *to see that the facts proved constitute prima facie an offense which would have been within judicial cognizance if done in this country."* (Italics added.)

The principle that a nation will not grant extradition for acts not there made criminal is laid down by authoritative writers on the law of extradition.

Biron and Chalmers, in their work on Extradition, p. 11, say: "As against the State where the fugitive is found his claim for protection is imperative, unless it can be proved that had his act taken place therein it would have involved the transgression of the laws of that State." Sir Robert Phillimore, 1 International Law, 3rd ed., § 367, p. 521, says: " There are two circumstances to be observed . . . in . . . cases of Extradition:—1. That the country demanding the criminal must be the country in which the crime is committed. 2. That the act done, on account of which his Extradition is demanded, must be considered as a crime by both States." Pomeroy, International Law, ed. by Woolsey, § 198, p. 237, says: " The act done must be such as is regarded as a crime by both states; this would cut off the case of all mere political offenders." Moore, Extradition, § 96, p. 112, says: " While it is an accepted principle that the acts for which extradition is demanded must constitute an offense according to the laws of both countries, yet the laws which have actually been violated are those of the demanding government."

VII. The opinion of the majority leans but lightly upon the construction put upon the treaty by the letters of Secretary Calhoun, brought into view by the order for reargument.

When the historical background and the precise point under consideration are held in mind, it is plain that his contentions have no bearing upon the question before us. For years prior to 1842 the right of owners to have fugitive slaves returned to them had become a matter of grave concern in southern States. Mr. Calhoun was a leader in the struggle for the vindication of that right and the maintenance of slavery. England, having earlier moved to suppress slave-trading, had then quite recently abolished slavery. Many of her people strongly favored abolition in the United States and everywhere. Many slaves had fled from this country to the West Indies and to Canada. Shortly before the case in which Secretary Cal-

houn wrote the letters in question, it was earnestly maintained by leaders in the House of Lords that slaves who for the purpose of securing their freedom killed their masters were guilty of no offense.[5] Some of England's most eminent statesmen and jurists opposed extradition of fugitive slaves for any transgression of our laws. For example, Aberdeen said: "Not only was a fugitive slave guilty of no crime in endeavoring to escape from a state of bondage, but he was entitled to the sympathy and encouragement of all those who were animated by Christian feelings." 70 Hansard, Third Series, p. 474.

The Secretary's letters were written, not as rulings, but solely for the purpose of furnishing the American minister arguments to be submitted to Lord Aberdeen as Foreign Secretary. The case was this: Slaves in Florida killed those who held them in service and fled to British West Indies. That state indicted them for murder. The United States, upon the indictment without more, demanded their extradition. The insular court held no ground for extradition had been shown. It said: "An indictment *per se* can never be received as evidence. It is not enough for us to know that the American jury thought the parties guilty. We ought to know the grounds upon which they thought them guilty. What may constitute the crime of murder in Florida may be very far from doing so according to the British laws or even in the laws of the northern States of America."

The Secretary, deeply moved by the implied suggestion that homicide committed by a slave in an effort to secure release from bondage was justifiable or excusable, directed the American minister to present the case to the British

---

[5] The occasion of these utterances was the mutiny, seizure of *The Creole* in American waters, the killing of those in charge of the ship and flight of 120 slaves to Nassau, where a number of them were taken into custody, partly for murder and partly for piracy. See 60 Hansard, Parliamentary Debates, 3rd Series, pp. 26, 318.

Government. He maintained that, as in this country the Florida indictment was sufficient to justify the apprehension of the person accused and his commitment for trial, then by virtue of the proviso in Article X the asylum country was bound to hold that the indictment without more was sufficient to require extradition of the fugitive. As shown by our minister's report, Lord Aberdeen merely held that under the Act of Parliament carrying the treaty into effect " an indictment is not of itself sufficient ground for giving up a fugitive." And he remarked that the same answer would have been given had the persons demanded been free. The question presented and decided was merely one of evidence. The Secretary's suggestions as to requirements of criminality in the asylum country were not germane, and therefore without weight as an official interpretation.

His suggestion, arguendo, that the treaty requires extradition for acts not made criminal in the place of asylum has never been adopted in England. That country has never claimed, and does not now maintain, that the interpretation so brought forward is binding on the United States. It has never been followed in practice. It is directly repugnant to the contentions of the United States, and the opinion of this court, in *Wright* v. *Henkel, supra,* and conflicts with a long line of judgments following that decision. It is disregarded, indeed impliedly repudiated, in the official correspondence between Ambassador Choate and the Marquess of Lansdowne, above mentioned. It follows that Secretary Calhoun's contentions, even if they were pertinent in the case where made, do not make in favor of extradition or lend any support to the court's decision.

I am of opinion:

The acts of receiving of which petitioner is accused in England are not made criminal in Illinois where he was found. That is now practically conceded by England.

The court impliedly so holds and necessarily—even if *sub silentio*—overrules its decision on that point in *Kelly* v. *Griffin,* 241 U.S. 6, 15.

The contracting parties, upon adequate grounds and in accordance with uniform usage, have always adhered to the principle that extradition will not be granted for acts that are not deemed criminal in the place of asylum.

There is nothing in the treaties to support the majority opinion that, while England is not similarly bound, the United States agreed to deliver up fugitives for acts not criminal in the place of asylum.

The proviso in Article X prescribes the evidence that the demanding country is required to produce. It impliedly indicates that neither party agreed to extradite for acts not criminal under its laws.

The letters of Secretary Calhoun pointed to by our order for reargument do not support the majority opinion. They have no bearing upon the question presented.

The judgment of the Circuit Court of Appeals should be reversed.

I am authorized to say that MR. JUSTICE BRANDEIS and MR. JUSTICE ROBERTS join in this dissent.